**No. 25-50153**

# In the United States Court of Appeals for the Fifth Circuit

DOCTORS HOSPITAL OF LAREDO; LAREDO PHYSICIANS GROUP,

Plaintiffs-Appellants/Cross-Appellees

*v.*

DR. RICARDO CIGARROA; CIGARROA HEART AND VASCULAR INSTITUTE,

Defendants-Appellees/Cross-Appellants

LAREDO TEXAS HOSPITAL COMPANY, L.P., DOING BUSINESS AS LAREDO MEDICAL CENTER,

Defendant-Appellee

On Appeal from the United States District Court, Western District of Texas, San Antonio Division, No. 5:21-cv-1068, Hon. Xavier Rodriguez, Judge Presiding

## APPELLANTS' BRIEF

**YETTER COLEMAN LLP**
  Constance H. Pfeiffer
  cpfeiffer@yettercoleman.com
  Bryce L. Callahan
  Justin S. Rowinsky
  Katherine S. Dannenmaier
  811 Main Street, Suite 4100
Houston, Texas 77002
713-632-8000

**Attorneys for Appellants**

## CERTIFICATE OF INTERESTED PERSONS

No. 25-50153

DOCTORS HOSPITAL OF LAREDO; LAREDO PHYSICIANS GROUP,

Plaintiffs-Appellants/Cross-Appellees

*v.*

DR. RICARDO CIGARROA; CIGARROA HEART AND VASCULAR INSTITUTE,

Defendants-Appellees/Cross-Appellants

LAREDO TEXAS HOSPITAL COMPANY, L.P., DOING BUSINESS AS LAREDO MEDICAL CENTER,

Defendant-Appellee

The undersigned counsel of record certifies the following listed persons have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate their possible recusal or disqualification:

1.     Plaintiffs-Appellants/Cross-Appellees Doctors Hospital of Laredo and Laredo Physicians Group are represented in the Fifth Circuit by:

Constance H. Pfeiffer
Bryce L. Callahan
Justin Rowinsky
Katherine Dannenmaier
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

Additional counsel who represented the Plaintiffs-Appellants/Cross-Appellees Doctors Hospital of Laredo and Laredo Physicians Group in the district-court proceedings are:

James E. Zucker
Bryce L. Callahan
Justin Rowinsky
Katherine Dannenmaier
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

2.    Defendant-Appellees/Cross-Appellants Dr. Ricardo Cigarroa and Cigarroa Heart and Vascular Institute are represented in the Fifth Circuit by:

Peter D. Kennedy
Graves Dougherty Hearon &
Moody PC
401 Congress Avenue, Suite 2700
Austin, Texas 78701
512-480-5623

Jason Michael Powers
Vinson & Elkins LLP
Texas Tower
845 Texas Avenue, Suite 4700
Houston, Texas 77002
713-758-3302

Counsel who represented Defendants-Appellees/Cross-Appellants Dr. Ricardo Cigarroa and Cigarroa Heart and Vascular Institute in the district-court proceedings are:

Guillermo A. Alarcon
Peter D. Kennedy
Graves Dougherty Hearon &
Moody PC
401 Congress Avenue, Suite 2700
Austin, Texas 78701

Jason M. Powers
James Lewis Leader, Jr.
Ryan Yang Sun
Vinson & Elkins LLP
Texas Tower

512-480-5623

845 Texas Avenue, Suite 4700
Houston, Texas 77002
713-758-3302

Martha Louise Cigarroa
Steve A. Whitworth
Whitworth Cigarroa PLLC
602 Calton Road, Suite 201
Laredo, Texas 78041
(956) 727-4441

3.    Defendant-Appellee Laredo Texas Hospital Company, L.P., doing business as Laredo Medical Center is represented in the Fifth Circuit by:

Stacy R. Obenhaus
Foley & Lardner LLP
2021 McKinney Avenue
Dallas, Texas 75201
(214) 999-4868

James G. Munisteri
Foley & Lardner LLP
1000 Louisiana, Suite 2000
Houston, Texas 77002
(713) 276-5752

Counsel who represented Defendant-Appellee Laredo Texas Hospital Company, L.P. doing business as Laredo Medical Center in the district-court proceedings are:

James G. Munisteri
Foley & Lardner LLP
1000 Louisiana, Suite 2000
Houston, Texas 77002
(713) 276-5752

Thomas A. Leonard
Foley & Lardner LLP
2021 McKinney Ave., Ste. 1600
Dallas, Texas 75201

/s/ Constance H. Pfeiffer
Constance H. Pfeiffer
*Attorney of record for*
*Appellants/Cross-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

While this appeal is complex and record-intensive, the errors involve misapplication of settled legal standards and could easily be decided on the briefs. If the Court believes oral argument would aid the decisional process, Appellants would be happy to present it.

## TABLE OF CONTENTS

Statement Regarding Oral Argument ……………………………………v

Table of Authorities ...........................................................................ix

Statement of Jurisdiction ..................................................................1

Statement of Issues ...........................................................................2

Introduction .......................................................................................3

Statement of the Case .......................................................................5

I.    Factual Background .................................................................5

      A.    The interventional cardiology market in Laredo is underserved..........5

      B.    Seeing the need for more interventional heart doctors, DHL seeks to expand its practice and increase patient access to critical care. ..................................................................................7

      C.    The Cigarroas, the Cigarroa Institute, and LMC agree to cut off DHL. .........................................................................8

      D.    Dr. Cigarroa threatened a new recruit (Dr. Feldman) to prevent him from working at DHL. .......................................9

      E.    The Cigarroa Institute conspired with LMC to shift the practices of the Cigarroa Institute's three doctors to be exclusive to LMC. ...................................................................13

      F.    Even after DHL files this lawsuit, LMC still believes Defendants will be able to monopolize the market...........15

      G.    Defendants continue to scare recruits away from DHL and Laredo......................................................................16

      H.    The Cigarroa Institute's conspiracy limits interventional heart care in Laredo. .........................................................16

II.    Procedural Background.........................................................19

Summary of the Argument....................................................................... 21

Standard of Review ................................................................................. 23

Argument ................................................................................................. 24

I.     The Section 2 Claim for Attempted Monopolization Should Be
       Remanded. ................................................................................... 24

       A.     A § 2 claim for attempted monopolization requires proof of
              predatory conduct with *potential* anticompetitive effects.................. 25

       B.     Evidence of threats and exclusionary conduct shows triable
              issues of predatory attacks with potential anticompetitive
              effects. ...................................................................................... 27

              1.     Defendants threatened a new market entrant........................... 27

                     a.     Threatening to withhold referrals to deter a new
                            market entrant is predatory conduct. ........................... 27

                     b.     As in *Microsoft*, the evidence shows triable issues of
                            predatory threats. ......................................................... 28

              2.     The Cigarroa Institute attempted to monopolize Laredo
                     cardiology by cutting off DHL and working only with
                     LMC. ....................................................................................... 31

                     a.     Anticompetitive conduct should be considered
                            holistically. ...................................................................... 31

                     b.     A reasonable jury could conclude that the Cigarroa
                            Institute's scheme against DHL, viewed as a
                            whole, was predatory and anticompetitive. ................... 32

       C.     The district court mistakenly required proof of actual
              anticompetitive effects and drew inferences against the
              evidence.......................................................................................... 35

II.    The Section 1 Claim for Horizontal Conspiracy Should Be Remanded.......... 37

       A.     This case involves a horizontal conspiracy. ........................................ 38

B.    *MM Steel* confirms that facts like these are a horizontal conspiracy subject to *per se* liability. ....................................... 39

    1.    LMC and the Cigarroa Institute formed a horizontal conspiracy that merits *per se* treatment. ...................................40

    2.    Dr. Cigarroa's horizontal conspiracy with other doctors also merits *per se* treatment. ......................................................42

C.    The district court erred in rejecting *per se* liability. ............................ 44

    1.    The district court erred by misframing the relevant conspiracies. ....................................................................44

    2.    The district court improperly disregarded *MM Steel*. ............... 46

    3.    *Leegin* does not change the analysis. ......................................... 47

D.    In any event, the district court erred when it concluded that DHL had not offered sufficient evidence to satisfy the rule of reason. ....................................................................................................50

    1.    DHL showed anticompetitive effects via market structure evidence.....................................................................................51

    2.    DHL showed anticompetitive effects via care delay evidence................................................................................... 53

    3.    DHL showed anticompetitive effects via decreased procedure counts................................................................. 55

    4.    DHL showed anticompetitive effects via higher costs and patient harm. ...................................................................... 55

III.    A Reasonable Jury Could Find Antitrust Injury.......................................... 59

Conclusion ..................................................................................................................... 62

Certificate of Service..................................................................................................... 63

Certificate of Compliance ............................................................................................ 64

## TABLE OF AUTHORITIES

PAGE(S)

### CASES

*Alexander v. Nat'l Farmers Org.*,
687 F.2d 1173 (8th Cir. 1982) .................................................................. 28

*Associated Radio Serv. Co. v. Page Airways, Inc.*,
624 F.2d 1342 (5th Cir. 1980) ..................................................................31

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
49 F.4th 520 (5th Cir. 2022) .............................................................56, 61

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) .................................................................................. 59

*Chase Mfg., Inc. v. Johns Manville Corp.*,
84 F.4th 1157 (10th Cir. 2023) ............................................................... 28

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)...........................................................................39, 55

*Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.*,
679 F.2d 516 (5th Cir. 1982)................................................................... 52

*Doctors Hospital of Jefferson, Inc. v. Se. Med.l Alliance, Inc.*,
123 F.3d 301 (5th Cir. 1997) ............................................................60, 61

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
732 F.2d 480 (5th Cir. 1984) .................................................................. 52

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024)................................................................. 56

*Feminist Women's Health Ctr. v. Mohammad*,
586 F.2d 530 (5th Cir. 1978)............................................................. 28, 43

*FTC v. Indiana Federation of Dentists*,
476 U.S. 447 (1986)................................................................................. 48

*FTC v. Meta Platforms, Inc.*,
   2024 WL 4772423 (D.D.C. Nov. 13, 2024) ........................................51

*FTC v. Qualcomm, Inc.*,
   969 F.3d 974 (9th Cir. 2020) ........................................ 35

*Heatransfer Corp. v. Volkswagenwerk, A. G.*,
   553 F.2d 964 (5th Cir. 1977) ........................................ 52

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ........................................ 52

*Impax Labs., Inc. v. FTC*,
   994 F.3d 484 (5th Cir. 2021) ........................................50, 52, 58

*In re Cardizem CD Antitrust Litig.*,
   332 F.3d 896 (6th Cir. 2003) ........................................ 44

*In re Wholesale Grocery Prods. Antitrust Litig.*,
   752 F.3d 728 (8th Cir. 2014) ........................................ 59

*Klor's, Inc. v. Broadway–Hale Stores, Inc.*,
   359 U.S. 207 (1959) ........................................ 42

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ........................................ 47, 48

*Marucci Sports, LLC v. NCAA*,
   751 F.3d 368 (5th Cir. 2014) ........................................36, 50, 54

*Mid-Texas Commc'ns Sys., Inc. v. AT&T*,
   615 F.2d 1372 (5th Cir. 1980) ........................................ 35

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
   806 F.3d 835 (5th Cir. 2015) ........................................*passim*

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ........................................ 38

*Multiflex, Inc. v. Samuel Moore & Co.*,
   709 F.2d 980 (5th Cir. 1983) ........................................26, 61

*N. Tex. Specialty Physicians v. FTC*,
   528 F.3d 346 (5th Cir. 2008) ...................................................... 44, 48

*NCAA v. Board of Regents*,
   468 U.S. 85 (1984) ...................................................... 44, 45

*Nw. Wholesale Stationers v. Pac. Stationery & Printing Co.*,
   472 U.S. 284 (1985) ...................................................... 48

*NYNEX Corp. v. Discon, Inc.*,
   525 U.S. 128 (1998) ...................................................... 41

*Ohio v. Am. Express*,
   585 U.S. 529 (2018) ......................................................50, 51, 54, 55

*Polk Bros v. Forest City Enters.*,
   776 F.2d 185 (7th Cir. 1985) ...................................................... 58

*Poller v. Columbia Broad. Sys., Inc.*,
   368 U.S. 464 (1962) ...................................................... 23

*Pulse Network, LLC v. Visa, Inc.*,
   30 F.4th 480 (5th Cir. 2022) ......................................................23, 31, 60, 61

*Rossi v. Standard Roofing, Inc.*,
   156 F.3d 452 (3d Cir. 1998) ...................................................... 44

*Schine Chain Theatres v. United States*,
   334 U.S. 110 (1948), *overruled in other part by Copperweld Corp. v.
   Indep. Tube Corp.*, 467 U.S. 752 (1984)......................................................31

*Shields v. World Aquatics*,
   2024 WL 4211477 (9th Cir. Sept. 17, 2024) ...................................................... 55

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993)...................................................... 24

*Standard Oil v. United States*,
   221 U.S. 1 (1911)......................................................35, 36

*Swift & Co. v. United States*,
   196 U.S. 375 (1905) ...................................................... 56

*Taylor Pub. Co. v. Jostens, Inc.*,
    216 F.3d 465 (5th Cir. 2000) ........................................................*passim*

*Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*,
    496 F.3d 403 (5th Cir. 2007) .................................................... 23, 49

*United States v. Am. Airlines, Inc.*,
    743 F.2d 1114 (5th Cir. 1984) ...............................................26, 30, 32

*United States v. Gen. Motors Corp.*,
    384 U.S. 127 (1966) .................................................................. 38, 42

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................28, 29, 31

*Walker v. U-Haul Co. of Miss.*,
    747 F.2d 1011 (5th Cir. 1984) ...........................................................61

*Woods Expl. & Producing Co. v. Aluminum Co. of Am.*,
    438 F.2d 1286 (5th Cir. 1971) ...............................................32, 34, 36

## STATUTES & RULES

15 U.S.C. § 1 .........................................................................*passim*

15 U.S.C. § 2 .........................................................................*passim*

28 U.S.C. § 1291 .......................................................................... 1

28 U.S.C. § 1331........................................................................... 1

28 U.S.C. § 1337 .......................................................................... 1

28 U.S.C. § 1367 .......................................................................... 1

Fed. R. App. P. 4(a)(1)(A) ............................................................. 1

Fed. R. Civ. P. 56 ....................................................................... 23

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367. It entered final judgment for Defendants on January 28, 2025. ROA.6848. Plaintiffs-appellants Doctors Hospital of Laredo and Laredo Physicians Group filed a timely notice of appeal on February 26, 2025. ROA.6875-76; Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

After finding evidence of agreements to make threats and engage in a concerted and sudden refusal to deal with a long-time partner, did the district court err by granting summary judgment in this complex antitrust case under 15 U.S.C. §§ 1 and 2 by mistakenly applying the wrong legal standards to each claim to require proof of actual anticompetitive effects?

Specifically—

I.    In a claim for attempted monopolization under 15 U.S.C. § 2, did the district court err by requiring evidence of actual effects when settled law for attempt claims only requires proof of *potential* effects?

Should summary judgment thus have been denied based on evidence of defendants' predatory conduct, including threatening a new physician to deter him from joining a hospital in an underserved market and terminating a profitable partnership with that hospital, all posing a grave risk of eliminating one of only two Laredo providers of heart attack care?

II.   In a claim for a horizontal conspiracy in restraint of trade under 15 U.S.C. § 1, did the district court misapply binding precedent that recognizes horizontal conspirators who concertedly refuse to deal are subject to *per se* liability, which is anticompetitive by definition and does not require independent evidence of anticompetitive effects? *See MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835 (5th Cir. 2015).

III.  The district court concluded that there is no antitrust injury in this case because there is no antitrust violation. If this Court remands either the § 1 or § 2 claim, should it likewise hold that there is a triable issue of fact on antitrust injury or remand that issue to the district court?

## Introduction

This antitrust case arises in Laredo's market for interventional cardiology services, which is woefully underserved. Whereas similarly-sized markets have 15+ physicians for heart attack care, at the time of this case Laredo had only five. Of those five physicians, three (and later four) were bound by family ties that inspired them to act anticompetitively to monopolize and protect their family's market share.

Laredo has only two hospitals that provide acute interventional cardiology services: Plaintiff Doctors Hospital of Laredo (DHL) and its larger counterpart, Defendant Laredo Medical Center (LMC). In 2020, DHL sought to address the underserved market by expanding its practice and recruiting more interventional cardiologists. But this plan was not a welcome development for one of its key physicians, Dr. Ricardo Cigarroa, who preferred to have a captive market for his family and, most importantly, the two newest market entrants: his son and nephew.

Dr. Cigarroa saw a threat to his family's insular Laredo stronghold, controlled by himself, his brother (Dr. Carlos Cigarroa) and his son (Dr. Ricardo Cigarroa II). Rather than competing lawfully, Dr. Cigarroa and his Cigarroa Institute agreed with LMC to restrain and monopolize Laredo's interventional cardiology services market. His plan entailed a one-two punch: (1) threaten DHL's new recruits to dissuade them from coming, and (2) suddenly stop practicing at DHL.

This scheme abruptly cut off DHL from the interventional cardiologists practicing in Laredo and left DHL in a hiring lurch. After years of covering heart attack emergency calls and practicing interventional heart care primarily at DHL, Dr. Cigarroa used his family's leverage to successfully put DHL's interventional cardiology program at risk of closing.

Dr. Cigarroa texted LMC's CEO to gloat that "they [DHL] have nothing." LMC's CEO in turn crowed to his superiors that he expected LMC to have 90% of the Laredo cardiology market within the next 5 years. RE.7(ROA.6191).

DHL quickly moved to challenge Defendants' conduct under Sherman Act Section 1 (conspiracy to restrain trade) and Section 2 (attempted monopoly). The district court's opinion thoroughly lays out the extensive evidence of conspiracy to keep new interventional cardiologists out of Laredo, and it acknowledges extensive triable issues of fact supporting a conspiracy to eliminate DHL's practice. Yet the district court mis-stepped by also requiring proof of anticompetitive effects, which is not legally required to prove attempted monopolization or *per se* violations. In this respect, the district court's opinion granting summary judgment for Defendants is 95% correct—recounting the Plaintiffs' extensive evidence of predatory conduct— and only in need of correction on a basic aspect of the legal analysis. This Court should reverse and remand for trial.

**STATEMENT OF THE CASE**

## I.  Factual Background

### A.  The interventional cardiology market in Laredo is underserved.

Laredo has just two acute-care hospitals that provide interventional cardiology services: Plaintiff Doctors Hospital of Laredo (DHL) and its much-larger counterpart, Defendant Laredo Medical Center (LMC). ROA.4490.[1] The two hospitals compete to provide inpatient heart attack care and outpatient interventional heart care. ROA.4490.

Defendant Dr. Ricardo Cigarroa is part of a prominent family that has practiced medicine in Laredo for four generations. ROA.4428-4429. This case involves Dr. Ricardo Cigarroa—the ringleader and only named defendant—and three of his family members: his son, Dr. Ricardo Cigarroa II; his brother, Dr. Carlos Cigarroa; and their nephew, Dr. Joaquin Cigarroa IV. ROA.4428-4429.

Until the events giving rise to this lawsuit, Dr. Cigarroa had practiced through his company, Defendant Cigarroa Heart and Vascular Institute ("Cigarroa Institute") at both DHL and LMC since 2000, and since 2020, also at the Cigarroa Institute's own new clinic for outpatient services.[2] ROA.4436; ROA.4913.

---

[1] Plaintiff Laredo Physicians Group is affiliated with DHL and employs some physicians directly; for ease of reference, both Plaintiffs can be addressed collectively as DHL. *See* ROA.5951-5953.
[2] The Cigarroa Institute is interchangeable with the Cigarroa Interventional Institute, the Cigarroa Surgical Center, and the Cigarroa Clinic. *See* ROA.2136; ROA.4501-4502; ROA.5241.

All three facilities—DHL, LMC, and the Cigarroa Institute—have cardiac catheterization labs and compete to provide outpatient procedures. ROA.5006.

Dr. Cigarroa's son, Dr. Ricardo Cigarroa II, returned to Laredo in 2020 and joined the Cigarroa Institute. ROA.4465-4466. He originally took heart attack call at both LMC and DHL. ROA.4473.

Dr. Cigarroa's brother, Dr. Carlos Cigarroa, and his nephew, Dr. Joaquin Cigarroa IV, also practiced interventional cardiology in Laredo. Carlos takes heart attack call and practices interventional cardiology at both LMC and DHL. ROA.4489; ROA.4586. Joaquin returned to Laredo in 2021 and joined the Cigarroa Institute. ROA.4429. He worked at LMC and the Cigarroa Institute until he left Laredo in 2023. ROA.4429.

In 2020, there was only one other interventional cardiologist in Laredo: Dr. Pedro Diaz. ROA.4443; ROA.4470. With the Cigarroas comprising nearly all of Laredo's interventional cardiologists, they were poised to control interventional cardiology in Laredo and keep DHL from bringing in new competing physicians.

It is undisputed that Laredo is underserved by interventional cardiologists. *See* ROA.7104 (Cigarroa's counsel); ROA.4996 (DHL CEO); ROA.4914 (LMC CEO). In 2020, Laredo had only three interventional cardiologists for 260,000 people. ROA.4443, ROA.4470, RE.7(ROA.6295).

By comparison, San Angelo, Texas, had fifteen for 100,000 people—five times the number of interventional cardiologists for a smaller town. ROA.4567. Comparing Laredo and similarly sized cities, economist Dr. Kevin Pflum found that Laredo ranked "in the bottom third with 1.9 interventional cardiologists per 100,000 people." RE.7(ROA.6295). By contrast, other Texas towns each had between 3.3 and 8.9 interventional cardiologists per 100,000 people. RE.7(ROA.6295).

The maxim "time is muscle" applies to heart attack patients. ROA.4433-4434. Every minute that the heart muscle is deprived of oxygen is critical, so hospitals aim to treat heart attack patients within 90 minutes of their arrival. ROA.4281, ROA.4288. To meet that goal, a hospital must have at least one interventional cardiologist on "call" around the clock. ROA.4288. Otherwise, a hospital must turn away patients experiencing a heart attack. ROA.4289.

### B. Seeing the need for more interventional heart doctors, DHL seeks to expand its practice and increase patient access to critical care.

Within a month of starting as CEO for DHL in 2020, Ms. Emma Montes-Ewing sought to expand the hospital's interventional cardiology practice by recruiting new physicians. ROA.4565; ROA.4689; ROA.4691-4699.

Dr. Cigarroa quickly spoke out against this plan and made clear that he was "against this" recruitment of physicians outside of Laredo. ROA.4704. He "would have preferred [Montes-Ewing] . . . recruited through our practice [the Cigarroa

Institute]." RE.7(ROA.4704). Dr. Cigarroa also wanted her to wait "one year" until his son, Dr. Cigarroa II, who had recently arrived in Laredo, "gets settled" with "a chance to set his feet." RE.7(ROA.4704).

Dr. Cigarroa made clear that there would be consequences to threatening his family's dominance: "[M]y son is just beginning [and] was planning to base most [of] his practice [at DHL]." RE.7(ROA.4704). Now, "you proceed with this on your own . . . we will move in a different direction on our own." RE.7(ROA.4709).

## C. The Cigarroas, the Cigarroa Institute, and LMC agree to cut off DHL.

Dr. Cigarroa's influence and leverage were palpable even to DHL's recruits. The first physician DHL tried to recruit decided not come to work at DHL, citing concerns about the Cigarroas' control of the Laredo market. ROA.4725, ROA.4997.

Angry that DHL was recruiting new non-Cigarroa interventional cardiologists, the Cigarroas and the Cigarroa Institute planned to cut DHL off at the knees by shifting their practice away from DHL to practice acute care exclusively at LMC. ROA.4754-4755.

Dr. Cigarroa and his son emailed LMC's CEO, Jorge Leal, with a proposal. ROA.6673. On behalf of the Cigarroa Institute, they offered "to commit our services to Laredo Medical Center . . . to take full advantage and secure Webb County marketshare at LMC." ROA.6673; ROA.6505 (Laredo is in Webb County).

Leal texted back that same day: "Saw your email. I'm in." ROA.4737. Dr. Cigarroa followed up on behalf of himself, his brother, his son, and nephew to confirm, "We met as a family and all are on board to committing to LMC." ROA.4753-4755.

As LMC's CEO, Leal presented the plan to the President of Operations of LMC's parent company, Community Health Systems. ROA.6134. Leal identified the same "Cardiology shift" as one of the top five "Threats" to DHL (identified as LMC's "TOP COMPETITOR"). ROA.6134; ROA.6151; ROA.4491. Leal also identified the number one "Threat" to LMC's planned monopoly as "Physician recruitment by Doctors Hospital." RE.7(ROA.6150).

## D.    Dr. Cigarroa threatened a new recruit (Dr. Feldman) to prevent him from working at DHL.

If DHL could successfully recruit new physicians, it would derail the Cigarroa-LMC plan to monopolize the Laredo market. *See* RE.7(ROA.6150). So when DHL sought to address the shortage and recruit a new physician, Dr. Feldman, Dr. Cigarroa sprang into action with threats that would stop him from coming.

Dr. Feldman is an interventional cardiologist who practiced in San Antonio and had a research laboratory at the University of Texas Health Science Center-San Antonio ("UTHSCSA"). ROA.4581; ROA.4773. It was important to Dr. Feldman to maintain this research lab, and in his experience, he could do so regardless of

where in the state he also practiced. ROA.4581; ROA.4773. For example, he had previously provided part-time interventional heart care in McAllen with no consequences for his lab. ROA.4772. In fact, UTHSCSA had been aware of that part-time arrangement and never discouraged Dr. Feldman from working part-time at out-of-town clinics. ROA.4777; ROA.5264-5266.

The Cigarroas had close ties to UTHSCSA that they could leverage to suit their purposes. They refer about 90% of their structural heart patients to UTHSCSA. ROA.4478-4479. And one of Dr. Cigarroa's brother's had been the president of UTHSCSA. ROA.4824-4825. Dr. Cigarroa and his son even refer to UTHSCSA as "LMC North" and "Cigarroa Clinic North Campus." ROA.4483.

On July 17, 2021, Dr. Feldman signed a Letter of Intent with DHL. ROA.4800-4802. Soon afterward, Dr. Cigarroa texted and had an 11-minute phone call with Feldman's manager, Dr. Anderson, who, as Chief of the Cardiology division, would benefit from the increased volume of procedures through the Cigarroa Institute's referrals. ROA.4453; ROA.4477-4478; ROA.4663. There is no written record of their communications, because they both deleted all their texts with each other. ROA.4451; ROA.4454; ROA.6687.

But Dr. Cigarroa and Dr. Anderson admit that during the phone call they discussed Dr. Feldman and DHL's plans to recruit him. ROA.4453; ROA.6685.

Dr. Cigarroa also admits that he opposed Dr. Feldman coming to DHL and even "asked Dr. Anderson to share this concern with Dr. Feldman." ROA.4455, ROA.4983.

Dr. Anderson fully complied. In a one-on-one meeting soon after, Dr. Anderson "threatened" Dr. Feldman in a "commanding" tone. ROA.4774-4775, ROA.4784. Dr. Feldman testified that Dr. Anderson stated, "that if I went to Laredo, that my research lab would be taken away from me at the medical school." ROA.4774-4775; ROA.4780.

Dr. Feldman urgently texted DHL's CEO, Ms. Montes-Ewing, asking to speak with her about Dr. Cigarroa's threat and how he "is telling the University he controls 90% of the Laredo market":

| Dr Feldman Int Cardiologist < ███ 3320> | 8/5/2021, 6:53 AM |
| --- | --- |
| Emma<br>I need to speak with you concerning phone calls from Laredo to the medical school<br>Can you call me when u are free?<br>Marc<br>210 414 3320 | |
| Dr Feldman Int Cardiologist <+ ███ 3320> | 11:28 AM |
| Ricky is telling the University he controls 90% of the Laredo market.<br>Any information you can email me as a counter argument will help me<br>Marc | |

ROA.4814.

To try and "save" his research laboratory and persuade Dr. Anderson to rescind the threat, Dr. Feldman first approached the President of UTHSCSA, Dr. William Heinrich. ROA.4774-4775.

Dr. Feldman appealed to the UTHSCSA President with a business reason to help DHL and facilitate its recruitment of Dr. Feldman, proposing that DHL would refer its Laredo patients seeking care at other San Antonio hospitals to UTHSCSA. *See* ROA.5268; ROA.5271; ROA.5273.

But after speaking with Dr. Anderson, the UTHSCSA President emailed Dr. Feldman (copying Dr. Anderson) and cryptically instructed him to "work directly with Dr. Anderson in order to make a plan for the future." ROA.4816.

Dr. Feldman next appealed to George Hernandez, then the CEO of University Health San Antonio. ROA.4779. Dr. Feldman first gave a similar business reason for his plan to practice part-time in Laredo, and Mr. Hernandez spoke with DHL CEO Montes-Ewing about potentially collaborating with DHL if Dr. Feldman were to start practicing in Laredo. ROA.4556; ROA.4847-4849; ROA.4838. But Mr. Hernandez also took no action to remove the threat to Dr. Feldman's lab. ROA.4781.

Desperate, Dr. Feldman emailed Mr. Hernandez that "Ricky Cigarroa . . . does not want me working at DHL . . . I was told by [Dr. Anderson] that if I start in Laredo as a physician that my research lab will be taken away from me." ROA.4847. Mr. Hernandez did not respond but instead forwarded the email to in-house counsel. ROA.4847 (top of email redacted for privilege).

> George,
>
> I have signed a letter of intent with DHL to work as an interventional cardiologist. Ricky Cigarroa Sr
> does not want me working at DHL and called Allen to inform him of his concern. In response, I was
> told by Allen that if I start in Laredo as a physician that my research lab will be taken away from me

ROA.4847.

Having gone to "the head of the hospital [Hernandez] and . . . the head of the medical school [Dr. Henrich]," Dr. Feldman testified, "I figured if they wouldn't speak on my behalf, I was in trouble." ROA.4780. Dr. Feldman informed DHL that he could not start practicing in Laredo because of the threat to take away his lab. ROA.4855. Dr. Feldman testified that he would have started providing interventional cardiology care at DHL "but for" the threat to his lab. ROA.4782.

Dr. Feldman instead started practicing part-time in Kerrville, Texas. ROA.4782. This time, no one at UTHSCSA—including Dr. Anderson—discouraged him from working there or threatened to take away his research laboratory. ROA.4782.

### E. The Cigarroa Institute conspired with LMC to shift the practices of the Cigarroa Institute's three doctors to be exclusive to LMC.

While simultaneously blocking DHL's outside recruiting efforts, the Cigarroa Institute also implemented its plan to cut off DHL's interventional cardiology

department from the doctors already working in Laredo—even though the Cigarroa Institute's members had worked profitably at DHL for years. ROA.4443, 4474.

In August 2021, the Cigarroa Institute gave 90 days' notice to DHL that it was cutting off its services: Dr. Cigarroa and his son would cease providing heart attack call coverage at DHL and, with rare exceptions, would stop practicing at DHL. ROA.4871, ROA.4913.

Soon after, LMC's CEO, Leal, circulated a "Cardiovascular Business Strategy" that discussed Defendants' plan to monopolize interventional heart care in Laredo. ROA.5619-5631. Leal analyzed the effect the LMC-Cigarroa plan would have on DHL and concluded that being left with "a minority group of Cardiologists will be detrimental to our main competitor [i.e., DHL]" and put it "in a position to lead the market in Cardiovascular for years to come":

> **Competition:** The shift in Cardiology focus from Doctors Hospital of Laredo to Laredo Medical Center is significant. Left without a Cardiothoracic Surgeon and a minority group of Cardiologists will be detrimental to our main competitor. If LMC is able to capitalize and build a quality-focused service line with positive outcomes, we will be in a position to lead the market in Cardiovascular for years to come.

ROA.5624; *see also* ROA.5640; ROA.4913.

Leal foresaw that devastating blow this would have on DHL and anticipated "DHL Legal Involvement." ROA.5625.

In October, Leal nefariously texted Dr. Cigarroa with a plan of annihilation: "Let's take everything from [DHL]." RE.7(ROA.4944). Dr. Cigarroa agreed the plan was already working: "they [DHL] have nothing . . . stemi went on diversion," meaning that DHL had to turn away heart attack patients because they didn't have the necessary physicians or support staff to care for them. RE.7(ROA.4944).

**F.    Even after DHL files this lawsuit, LMC still believes Defendants will be able to monopolize the market.**

DHL recognized its interventional cardiology program was in imminent jeopardy and sued Defendants in October 2021 for multiple antitrust violations, including the two at issue in this appeal—attempted monopoly and conspiracy in restraint of trade. ROA.52-107.

But even a lawsuit did not stop Defendants. By the end of 2021, Dr. Cigarroa and his son, Dr. Cigarroa II, carried out their plan to cease providing interventional heart care at DHL. ROA.4913. Dr. Cigarroa and his son have worked only at LMC and the Cigarroa Institute ever since. ROA.4913.

At the end of 2022, LMC's CEO Leal presented an update to his boss, announcing that LMC's market share had increased because of "Cardiology shift (Cigarroas) to LMC" and "Provider/Service line disruption at DHL." ROA.6184-6185; RE.7(ROA.6191). And he wrote that his goal was for LMC to have "90%"

market share in Laredo cardiology within 5 years through "[c]ontinued partnership with Cigarroas." RE.7(ROA.6191).

### G.　Defendants continue to scare recruits away from DHL and Laredo.

In 2021, DHL worked to recruit and keep an interventional cardiologist named Dr. Cilingiroglu, who was quickly spooked by the Cigarroa stronghold on the market. Dr. Cilingiroglu asked DHL's CEO, Ms. Montes-Ewing, if he would "be safe in town while [the Cigarroas] are clearly after us?" ROA.4857-4859; ROA.4528-4529. After deciding to practice at DHL, he soon after resigned in 2024, citing Dr. Cigarroa's "bullying" and making him feel "threatened." ROA.4947-4958, ROA.4524. Dr. Joaquin Cigarroa has also left Laredo, leaving it with only five interventional cardiologists—just as it began in summer 2021. ROA.4429.

### H.　The Cigarroa Institute's conspiracy limits interventional heart care in Laredo.

The district court correctly concluded the foregoing facts provide triable issues on conspiracy and predatory threats: "a reasonable jury could conclude that Dr. Cigarroa conspired with Dr. Anderson to prevent Dr. Feldman from coming to Laredo by threatening to withhold referrals." ROA.6824.

And Plaintiffs' expert Dr. Pflum opined—as the district court recognized— that "excluding Dr. Feldman and [another recruit, Dr. Blanc] was anticompetitive because Defendants imposed artificial costs on potential recruits that resulted in

barriers to entry in Laredo and 'restricte[d] the supply of interventional cardiology services to Laredo.'" RE.7(ROA.6304) (quoted at ROA.6839).

Excluding Dr. Feldman caused short- and long-term consequences. Five years after DHL's CEO, Ms. Montes-Ewing, arrived and tried to start recruiting, Laredo and DHL are in a worse place than they started. Laredo continues to have only five interventional heart doctors for 260,000 people, with one available only for one week a month and another nearing retirement. ROA.5000; ROA.4517. Overall Laredo interventional cardiology procedures have *declined* since 2019. ROA.6107; ROA.6801-6802; Sealed ROA.8721.[3] DHL continues to try to recruit new interventional cardiologists. ROA.5000.

Meanwhile, the Cigarroa Institute's doctors' share of Laredo interventional cardiology procedures (provided at both LMC and its own clinic) increased by ten percentage points, from 56% to 66%. ROA.6590, Sealed ROA.8697.[4] And this higher share does not mean that Laredo's heart care gap has been filled by Defendants. Defendants have not brought a single new interventional cardiologist (or general cardiologist) to Laredo since August 2020, other than Dr. Joaquin Cigarroa—and he has since left. ROA.4468.

---

[3] 2019 is a more accurate barometer than 2020 procedures because 2019 procedure counts were not influenced by COVID-19. ROA.6107.

[4] Conservatively, this tally does not include procedures done by Dr. Carlos Cigarroa. ROA.6590.

The Cigarroas' exclusive shift to LMC and corresponding refusal to supply DHL with interventional heart care came close to eliminating DHL's practice in this area. When Dr. Cigarroa and his son stopped providing care at DHL, "it was almost going to shut down the program." ROA.4530-4531; ROA.4538-4539. By January 2022, because of the Cigarroa Institute's actions, DHL had only three interventional heart doctors: Dr. Cilingiroglu (one week per month), Dr. Carlos Cigarroa, and Dr. Pedro Diaz to provide heart attack call coverage and care to patients. ROA.4999; *see* ROA.4947-4958. That deep staffing shortage continued at DHL until May 2022. *See* ROA.4947-4958 (heart attack call schedules).

To make matters worse, this shortage prevented DHL from creating a new structural heart program, which offers critical advanced cardiology procedures such as valve replacements through non-surgical methods performed by a trained interventional cardiologist. ROA.4464. As of 2021, no structural heart procedures had been performed in Laredo. ROA.4476. Laredo patients needing this care were referred to far-away hospitals in San Antonio, requiring travel and overnight stays that could otherwise have been provided locally. ROA.4478-4479. ROA.4478-4479.

During their recruitment, DHL CEO Montes-Ewing, Dr. Cilingiroglu, and Dr. Feldman planned to start structural heart care at DHL. ROA.4791-4792 ("Q2 or Q3 of 2022, perhaps sooner"); ROA.4580; ROA.4788-4789; ROA.4519.

CEO Montes-Ewing also wanted to include Dr. Cigarroa II. ROA.4519. Dr. Cigarroa II and Dr. Cilingiroglu have the relevant training, and Dr. Feldman was interested in the training. ROA.4516-4517, ROA.4519. And Dr. Cilingiroglu had experience starting up structural heart programs. ROA.4515.

But the Cigarroa Institute's anticompetitive scheme precluded DHL from moving beyond the basic goal of covering clinic and emergency department patients. As Dr. Cilingiroglu explained, "in order to have the structural program you have to . . . build up your cardiology service line." ROA.4516.

Laredo still does not have enough heart doctors. Even by the fall of 2021, Laredo had only five permanent interventional cardiologists. ROA.4443; ROA.4470. And four years after the Cigarroa Institute implemented its scheme, DHL continues to look for another permanent interventional cardiologist. ROA.5000.

## II.    Procedural Background

DHL sued Defendants in federal court in October 2021, alleging violations of the Sherman Act, 15 U.S.C. §§1-2 for claims including conspiracy to restrain trade and attempted monopolization, seeking damages and injunctive relief. ROA.52; ROA.243-252; ROA.255-256.

Defendants moved for a traditional summary judgment. ROA.2131-2181. No one contested that a relevant market is interventional cardiology services in Laredo.

ROA.6814; *see* ROA.2173-2174. Instead, Defendants focused on the existence of the conspiracy and the predatory conduct aspects of each claim. *See* ROA.2131-2181.

In a lengthy opinion, the district court recognized the substantial evidence that the Cigarroa Institute had conspired with LMC to eliminate DHL's interventional cardiology department. ROA.6781-6847. It found ample evidence that the Cigarroa Institute and LMC conspired with its one-two punch—(1) using threats to keep out new cardiologists and (2) colluding to cut off DHL from the Laredo market for interventional cardiology:

- "[A] reasonable jury could conclude that Dr. Cigarroa conspired with Dr. Anderson to prevent Dr. Feldman from coming to Laredo by threatening to withhold referrals from [UTHSCSA] . . . ." ROA.6824.

- "The Court agrees that Defendants' explicit statements constitute direct evidence of a concerted refusal to deal with DHL . . . [a]nd further reveal an intent to 'take everything from [DHL]' [and] leave them 'totally inept.'" ROA.6818-6819.

After reciting the elements for both § 1 and § 2 claims, the district court concluded that DHL had cited sufficient evidence for a reasonable jury to find there was a conspiracy, but nevertheless granted summary judgment based on a supposed lack of evidence of anticompetitive effects. ROA.6816-6842, 6843-6865.

Plaintiffs timely appealed. ROA.6875-6876.

## SUMMARY OF THE ARGUMENT

The district court correctly recognized extensive evidence of Defendants' concerted predatory scheme to eliminate competition and monopolize the market, perpetuating harm to an underserved community and reducing access to critical heart care. Yet the court misapplied settled legal standards under both Sections 1 and 2 of the Sherman Act by requiring proof of actual anticompetitive effects, rather than recognizing that attempted monopolization claims require only a showing of predatory conduct with the potential for anticompetitive effects, and that horizontal conspiracies involving concerted refusals to deal are *per se* unlawful even without such proof. The summary judgment should be reversed and both claims remanded.

**I.** Under § 2, the district court improperly required evidence of actual anticompetitive effects for attempted monopolization, contrary to this Court's precedent, which holds that potential effects suffice. The record contains ample evidence of predatory conduct: the Cigarroa Institute threatened and deterred new physician recruits, abruptly terminated its doctors' own longstanding relationships with DHL, and orchestrated a scheme to shift the Cigarroa Institute's acute practice exclusively to LMC—all with the intent and dangerous probability of monopolizing the market. These actions posed a grave risk to one of only two providers of acute interventional cardiology care in Laredo, a market already critically underserved.

- 21 -

**II.** Under § 1, the district court failed to apply binding precedent from *MM Steel*, which holds that horizontal conspiracies—such as the agreement between LMC and the Cigarroa Institute to exclude DHL—are subject to *per se* liability, even when vertical agreements are also present. The evidence shows a horizontal conspiracy among competitors, implemented through concerted refusals to deal and threats to new market entrants, which is precisely the type of conduct the *per se* rule is designed to address. The district court's reliance on rule-of-reason analysis and its disregard of the horizontal nature of the conspiracy was error.

Even under the rule of reason, however, DHL presented substantial evidence of anticompetitive effects. This included market structure data showing high concentration and barriers to entry, direct evidence of care delays and reduced procedure counts, and increased costs resulting from the exclusionary scheme. The district court improperly weighed the evidence and drew inferences against DHL, rather than in its favor as required at summary judgment.

**III.** Finally, the district court's conclusion that there was no antitrust injury was premised solely on its erroneous finding of no antitrust violation. If this Court reverses on either claim, it should also find a triable issue of fact on antitrust injury or remand that issue for further proceedings.

## STANDARD OF REVIEW

The Supreme Court cautions against summary judgment in antitrust cases like this one: "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962).

This Court reviews summary judgment *de novo. Pulse Network, LLC v. Visa, Inc.*, 30 F.4th 480, 487 (5th Cir. 2022). Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all inferences in its favor." *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007).

**ARGUMENT**

The Sherman Act protects consumers by fostering fair and open competition. 15 U.S.C. §§ 1 & 2. Section 1 bars "Every contract . . . or conspiracy, in restraint of trade or commerce," while Section 2 bars anticompetitive conduct to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize." The evidence supports claims under both sections.

## I.     The Section 2 Claim for Attempted Monopolization Should Be Remanded.

"An attempted monopolization claim has three elements: (1) the defendant engaged in predatory or exclusionary conduct, (2) the defendant had a specific intent to monopolize, and (3) there was a dangerous probability that the defendant would successfully attain monopoly power." *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 474 (5th Cir. 2000) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

Defendants did not challenge the second element, tacitly conceding there were triable issues of fact on their specific intent to monopolize. Nor did they dispute that the relevant market is interventional cardiology in Laredo. *Cf.* ROA.2131-2181. While Defendants did challenge element three, that element was easily defeated with evidence that the Cigarroa Institute already had a large share of the highly concentrated Laredo market and believed their scheme would eliminate their only competition. ROA.6287; ROA.6291; RE.7(ROA.4944); RE.7(ROA.6191).

The district court analyzed and granted summary judgment only on the first element—regarding the Cigarroa Institute's predatory or exclusionary conduct. ROA.6845. The district court acknowledged evidence supporting predatory conduct, yet then applied the wrong legal standard to require actual anticompetitive effects. ROA.6845. The claim should be remanded because there is ample evidence of predatory conduct, and an attempt claim, by definition, only requires proof of *potential* effects.

### A. A § 2 claim for attempted monopolization requires proof of predatory conduct with *potential* anticompetitive effects.

An attempt claim's standard for "predatory or exclusionary" conduct is "conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appear[s] capable of making a significant contribution to creating or maintaining monopoly power." *Jostens*, 216 F.3d at 475 (quotation omitted).

When a plaintiff alleges attempted monopoly, courts "look to the defendant's conduct and the market at the time the conduct occurred, rather than evaluating the conduct's effects after-the-fact." *Id*. While the actual effects "might be relevant to determining [the conduct's] predatory nature, the defendant's intent, or the state of the market," "actual effects are not by themselves necessary to sustain an attempted monopolization claim." *Id*.

- 25 -

Any other rule would give companies a "strong incentive" to attempt monopoly: if the attempt is successful, the company has a monopoly; if not, no antitrust liability attaches. *See United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1122 (5th Cir. 1984). Thus, this Court has "upheld attempted monopolization claims even when the plaintiff suffers no harm from the defendant's actions." *Jostens*, 216 F.3d at 474-75; *see Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 991 (5th Cir. 1983) (affirming an attempted monopoly finding—even though the plaintiff was able to keep and gain market share).

Based on this reasoning, this Court in *Jostens* held that a district court's conclusion that "specific acts were not predatory practices in the antitrust sense because of a lack of evidence that 'the actual effect [of these practices] was significant'. . . was based upon an erroneous interpretation of the term exclusionary practice." 216 F.3d at 481.

Sherman Act § 2 conduct need not meet any § 1 "rule of reason" tests. Conduct "may be reasonable and therefore not prohibited by section 1, yet still may constitute an attempt to monopolize if a specific intent to monopolize is shown." *Multiflex*, 709 F.2d at 990 (reversing § 1 damages but affirming § 2 violation).

- 26 -

**B.    Evidence of threats and exclusionary conduct shows triable issues of predatory attacks with potential anticompetitive effects.**

A reasonable jury could find that Defendants engaged in predatory conduct in two ways: (1) the Cigarroa Institute successfully deterred Dr. Feldman from coming to Laredo by threatening to withhold referrals from UTHSCSA, which in turn threatened to shut down Dr. Feldman's prized research lab; and (2) the Cigarroa Institute suddenly ended its members' work with DHL to leave DHL precariously understaffed. Either individually or combined, this conduct satisfies the test for showing predatory conduct.

**1.    Defendants threatened a new market entrant.**

The district court acknowledged that evidence exists that the Cigarroa Institute threatened to stop referring patients to UTHSCSA. ROA.6821. And the district court acknowledged that there is evidence that UTHSCSA's leaders in turn threatened Dr. Feldman's research lab if he went to Laredo. ROA.6820; *see* ROA.6821-6825 (finding that a jury could conclude that this threat resulted from Dr. Cigarroa's threat to Dr. Anderson). Standing alone, that evidence is sufficient for a jury to find anticompetitive conduct.

**a.    Threatening to withhold referrals to deter a new market entrant is predatory conduct.**

This Court recognizes that "intimidation and coercion of physicians" such that they feel "threatened professionally" can be anticompetitive conduct. *See*

- 27 -

*Feminist Women's Health Center v. Mohammad*, 586 F.2d 530, 537-39, 546-47 (5th Cir. 1978) (reversing summary judgment where defendants used third parties to threaten physician's career in attempt to eliminate plaintiff clinic). Likewise, threats to deter new entrants or existing competitors from expanding market share are anticompetitive. *See, e.g.*, *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1171-72 (10th Cir. 2023) (reversing summary judgment where defendant threatened to refuse to supply a downstream company if it bought from defendant's rival); *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1197-99, 1191-92, 1208 (8th Cir. 1982) (holding that "threatened supply cutoff was unlawfully coercive").

      **b.**     **As in *Microsoft*, the evidence shows triable issues of predatory threats.**

In a highly analogous case involving monopolistic threats, the D.C. Circuit affirmed that it was "exclusionary" when "Microsoft threatened Intel that if it did not stop aiding [competitor] Sun . . . Microsoft would refuse to distribute Intel technologies bundled with Windows," and "Intel capitulated." *United States v. Microsoft*, 253 F.3d 34, 77-78 (D.C. Cir. 2001). Evaluating the district court's anticompetitive conduct liability finding after a bench trial, the D.C. Circuit held that "Microsoft's threats to Intel were exclusionary, in violation of Section 2 of the Sherman Act." *Id.* at 78.

This case echoes *Microsoft*, as the threat here is similarly anticompetitive. Just as Microsoft's leaders "urged Intel not to help Sun," *Microsoft*, 253 F.3d at 77, Dr. Cigarroa told Dr. Feldman's boss (Dr. Anderson) that he opposed Dr. Feldman's work at DHL and "asked Dr. Anderson to share this concern with Dr. Feldman." ROA.4983.

Just as "Microsoft threatened Intel that if it did not stop aiding Sun on the multimedia front, then Microsoft would refuse to distribute Intel technologies bundled with Windows," *Microsoft*, 253 F.3d at 77, Dr. Cigarroa threatened Dr. Anderson and UTHSCSA that if they did not stop Dr. Feldman from coming to Laredo, the Cigarroa Institute would withhold referrals to UTHSCSA, which coerced UTHSCSA into threatening Dr. Feldman with the loss of his lab. ROA.6821. Just as Microsoft's evidence showed that Microsoft intended to and did convince "Intel to stop helping Sun," *Microsoft*, 253 F.3d at 77, here the record shows that the Cigarroa Institute intended to and did stop Dr. Feldman from coming to DHL. ROA.4983; ROA.4811. In fact, Dr. Feldman testified that he would have started at DHL "but for" the threat from Dr. Anderson, which was itself motivated by Dr. Cigarroa's threat. ROA.4782.

And just as Microsoft did not "offer any procompetitive justification for pressuring Intel not to support cross-platform Java," *Microsoft*, 253 F.3d at 77, the

district court emphasized that "Defendants have not pointed to any procompetitive justifications for Dr. Anderson's threat to Dr. Feldman." ROA.6825. This was not "competition on the merits." *Jostens*, 216 F.3d at 475 (quotation omitted).

The district court thus concluded that these threats combined to prevent Dr. Feldman from coming to Laredo: "Taken together, a reasonable jury could conclude that Dr. Cigarroa conspired with Dr. Anderson to prevent Dr. Feldman from coming to Laredo by threatening to withhold referrals from UTHSCSA." ROA.6824.

Deterring Dr. Feldman from practicing in this underserved market reduced procedures across Laredo, stopped the planned structural heart program, forced DHL to use locums tenens doctors,[5] and increased the Cigarroa Institute's members' market share from 56% of the market to 66% (and all Defendants' market shares to more than 70%).[6] ROA.6303-6311; Sealed ROA.8697; ROA.6614; ROA.4585-4587; ROA.6590; ROA.6289. Drawing reasonable inferences for DHL, this threat certainly satisfied the burden to show potential anticompetitive effects, i.e., "reasonably appears capable of making a significant contribution to creating or maintaining monopoly power." *Jostens*, 216 F.3d at 475 (quotation omitted).

---

[5] "Locums tenens" means "to hold the place of," and these short-term contract doctors are intended as stop-gap solutions. ROA.4292-4293.

[6] Aggregating market shares of rivals is justified when evaluating an attempted monopoly claim if, as here, the rivals are alleged to have conspired to monopolize. *See United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1118, 1122 (5th Cir. 1984) (where airline unsuccessfully tried to fix prices with rival, aggregating both firms' shares to evaluate attempt-to-monopolize claim).

Thus, just as the D.C. Circuit held that "Microsoft's threats to Intel were exclusionary, in violation of Section 2 of the Sherman Act," *Microsoft*, 254 F.3d at 278, so too here. The evidence allows a jury to find that the Cigarroa Institute's threat to Dr. Feldman via Dr. Anderson was anticompetitive, in violation of § 2.

### 2. The Cigarroa Institute attempted to monopolize Laredo cardiology by cutting off DHL and working only with LMC.

After successfully threatening Dr. Feldman, the Cigarroa Institute suddenly cut off its doctors' services to DHL, reducing DHL's specialized care just when DHL needed it the most. Considered together with the threat against Dr. Feldman, the Cigarroas' sudden shift to working exclusively with LMC is anticompetitive.

#### a. Anticompetitive conduct should be considered holistically.

With respect to the sudden decision to cut off practicing at DHL to practice exclusively with LMC, it bears mention that anticompetitive schemes are evaluated holistically. Even if the discrete components of a scheme do not harm competition in isolation, they may "show a pattern of exclusionary behavior" when "[t]aken together." *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1354 (5th Cir. 1980); *see also Pulse Network, LLC v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022) (when evaluating antitrust injury from integrated scheme, evaluating effects in combination). "Even an otherwise lawful device may be used as a weapon in restraint of trade or in an effort to monopolize a part of trade or commerce." *Schine Chain*

- 31 -

*Theatres v. United States*, 334 U.S. 110, 119 (1948), *overruled in other part by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 763 n.8 (1984).

For instance, this Court has held that a "pattern of conduct" "may be held unlawful under the Sherman Act," even when each refusal to deal with a competitor, considered in isolation, could be "benign" or "innocent in and of themselves." *Woods Exploration & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286, 1308 (5th Cir. 1971).

Indeed, the principle that conduct must be considered together is so well-established that Defendants did not challenge it below. The district court's contrary method, ROA.6845, violates this Circuit's binding precedent and impairs federal, state, and private enforcers' challenges to anticompetitive schemes.

> **b.      A reasonable jury could conclude that the Cigarroa Institute's scheme against DHL, viewed as a whole, was predatory and anticompetitive.**

"Since the [Sherman] Act does not list or define the activities which may constitute the offense of attempted monopolization, [courts] must examine the facts of each case . . . .'" *Am. Airlines*, 743 F.2d at 1118. Under the correct test, a jury could conclude that, considered together, the Cigarroa Institute's scheme was conduct "other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appear[s] capable of making a significant

contribution to creating or maintaining monopoly power." *Jostens*, 216 F.3d at 475 (quotation omitted).

Considered in the light most favorable to DHL, the evidence shows a fact dispute on whether the Cigarroa Institute's scheme: (1) "reasonably appears capable of making a significant contribution to creating or maintaining monopoly power"; and (2) was conduct "other than competition on the merits." *Id.*

*First,* LMC's CEO, Leal, thought that the Cigarroa-LMC scheme would have the potential effect of creating a monopoly for LMC and foreclosing DHL's ability to compete:

- After the Cigarroa Institute gave its 90 days' notice to DHL, Leal circulated a "Cardiovascular Business Strategy" that stated, "Left without a Cardiothoracic Surgeon and a minority group of Cardiologists will be detrimental to our main competitor." ROA.5624.

- After the scheme was implemented, LMC CEO Leal and Dr. Cigarroa wanted to and believed they could "tak[e] everything from" DHL." RE.7(ROA.4944).

- Even after DHL sued, LMC expected that, taken together, Defendants' conduct would give them a "90%" market share in cardiology within 5 years. RE.7(ROA.6191).

Leal correctly understood the significant threat the Cigarroa Institute's threats posed for DHL. DHL's CEO, Ms. Montes-Ewing, explained that, after the Cigarroa Institute's interference with Dr. Feldman, the Cigarroas' exclusive shift to LMC "was almost going to shut down the program." ROA.4530-31, 4538-39.

*Second*, the evidence would allow a jury to find that the Cigarroa Institute's scheme was anticompetitive and not permissible competition on the merits. Defendants knew that, for the time being, they could not compete on facility quality because LMC's catheterization labs were older, darker, and had "Antiquated Equipment." ROA.6673; ROA.4473; ROA.4480; ROA.5625. Nor were the Cigarroas confident in their ability to compete on physician quality: Dr. Cigarroa asked DHL's CEO, Ms. Montes-Ewing, to hold off on recruiting while his son "set his feet." ROA.4704. LMC even identified the number one "Threat" to Defendants' planned monopoly as "Physician recruitment by Doctors Hospital." RE.7(ROA.6150). So, as Plaintiffs' expert Dr. Pflum opined, rather than compete "on the merits," the Cigarroa Institute threatened DHL's potential recruits and suddenly shifted its members' practices to work exclusively at LMC—all to cripple DHL's supply of interventional cardiologists. RE.7(ROA.6531).

Just like this Court concluded that the *Woods*' defendants' "harassment in drilling" combined with "concerted refusals to deal" converted "innocent activities in and of themselves . . . into an antitrust malefaction," so too did the combination of the Cigarroa Institute's threats and concerted refusal to deal constitute a violation of §2. 438 F.2d at 1308. "At least a jury could so find." *Id.* (reversing summary judgment on §2 claim).

## C. The district court mistakenly required proof of actual anticompetitive effects and drew inferences against the evidence.

As already discussed above at pages 25-26, an *attempted* monopolization claim only requires proof of *potential* anticompetitive effects. By definition, defendants who attempt to create a monopoly do not succeed, so the only required showing is the potential anticompetitive effects if the predatory conduct had worked.

The district court mistakenly required proof of *actual* anticompetitive effects, holding in a single sentence that "the exclusion of Dr. Feldman . . . is not anticompetitive in the antitrust sense as it lacks anticompetitive effects." ROA.6845. The face of the Opinion shows this error stemmed from citing inapplicable caselaw under § 1 rather than the attempted monopolization standard under § 2. *See* ROA.6844-6845 (referring to ROA.6839-6842).

The district court likely conflated the § 1 and § 2 standards inadvertently, as the parties did not dispute the controlling standards below. *Cf.* ROA.5035-5070. None of the three cases relied upon by the district court had been cited by Defendants, and they do not support applying § 1 rule-of-reason case law to a § 2 attempted monopolization claim.[7] ROA.6833 (Order at 53 n.34); ROA.6844.

---

[7] *Mid-Texas Communications System, Inc. v. AT&T* does not address attempted monopoly. *See generally* 615 F.2d 1372 (5th Cir. 1980). The cited sentence from the Ninth Circuit's decision in *FTC v. Qualcomm, Inc.* is *dicta*—in fact, the *Qualcomm* court did analyze Qualcomm's conduct under separate § 2 standards. *See* 969 F.3d 974, 995-97 (9th Cir. 2020). And in *Standard Oil v.*

The district court further conflated § 1 and § 2 caselaw when it relied on a § 1 rule-of-reason case to analyze § 2 competitive effects. ROA.6844-6845 (citing ROA.6840-6842); *see Marucci Sports, LLC v. NCAA*, 751 F.3d 368 (5th Cir. 2014). *Marucci Sports* is especially inapposite because it addresses a rule set by a professional organization, which enjoys less scrutiny under antitrust laws because professional organization rules are "entitled to a procompetitive presumption." 751 F.3d at 377; *see also id.* at 376, 374. But the threat at issue here is not such a rule and is not entitled to any presumption of pro-competitiveness. *See MM Steel*, 806 F.3d at 848 n.7 (rejecting application of rule-of-reason to anticompetitive conduct on this basis).

The summary judgment should be reversed on DHL's § 2 attempted monopoly claim. *See Woods*, 438 F.2d at 1308 (reversing summary judgment because even though "[b]uying and selling are innocent activities in and of themselves . . . the pattern of conduct alleged here may be held unlawful under the Sherman Act.").

---

*United States*, the sentence immediately preceding the district court's quote actually recognizes that § 2 attempted monopoly is more expansive than § 1. 221 U.S. 1, 61-62 (1911).

## II.   The Section 1 Claim for Horizontal Conspiracy Should Be Remanded.

DHL also brought a claim under § 1 for Defendants' horizontal conspiracy to foreclose DHL from providing its interventional cardiology services in Laredo. Yet the district court artificially narrowed the conduct at issue and then mistakenly held that a horizontal group boycott is not a *per se* violation under § 1 if there are also vertical agreements. ROA.6830. This Court's precedent squarely holds otherwise, and the evidence raises a triable issue about a conspiracy among horizontal competitors to foreclose DHL. Even under the rule of reason, however, DHL presented substantial evidence of anticompetitive effects.

"To establish liability under § 1 of the Sherman Act, a plaintiff must show that the defendants (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015) (citation and quotation omitted). On appeal, the only issues are whether there is evidence of a horizontal conspiracy under element one given the district court's findings of agreements between Dr. Cigarroa and Dr. Anderson and between LMC and the Cigarroa Institute, and legally, whether a horizontal conspiracy with vertical agreements aimed against one of the conspirators' competitors is a *per se* illegal restraint on trade under element two. The answer to both is Yes.

- 37 -

### A.    This case involves a horizontal conspiracy.

Antitrust law distinguishes between horizontal and vertical relationships. Horizontal relationships are "between competitors." *MM Steel*, 806 F.3d at 849. Vertical relationships are between suppliers and customers. *Id.*

"Whether a restraint on trade is per se illegal or is analyzed under the rule of reason is a key distinction in antitrust law." *Id.* at 848. *Per se* restraints are those which, "because of their pernicious effect on competition and lack of any redeeming virtue[,] are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *United States v. Gen. Motors Corp.*, 384 U.S. 127, 146 (1966).

Here, Defendants concede that the facilities (DHL, LMC, and the Cigarroa Institute) compete to provide interventional cardiology services and so are in a horizontal relationship. ROA.4490; ROA.5005-5006.

> **Facilities**: LMC, DHL, the Cigarroa Institute

The doctors, including Dr. Cigarroa and DHL's recruit, Dr. Feldman,[8] compete (or potentially compete) with each other, and so are in horizontal relationship with each other.

---

[8] While Dr. Anderson and Dr. Feldman were unwilling or coerced participants in the conspiracy, they were nonetheless part of it. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 766-68

> **Doctors:** Dr. Cigarroa, Dr. Ricardo Cigarroa II,
> Dr. Joaquin Cigarroa IV, Dr. Anderson, and Dr. Feldman

The doctors supply services to the facilities and so are in a vertical relationship with them. *MM Steel*, 806 F.3d at 849.



> **Facilities**: LMC, DHL, the Cigarroa Institute, UTHSCSA
>
> **Doctors:** Dr. Cigarroa, Dr. Cigarroa II, Dr. Feldman

The conspiracy to restrain the Laredo interventional cardiology market is "not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (vacating judgment for defendant). There are thus horizontal conspiracies to exclude DHL among the doctors and the facilities on their respective horizontal planes, mixed with vertical agreements between facilities and doctors.

> **B.**    ***MM Steel* confirms that facts like these are a horizontal conspiracy subject to *per se* liability.**

The type of *per se* restraint on trade at issue here is considered horizontal "group boycotts to foreclose an entrant from the market," which was thoroughly

---

& n.13 (1984), *cited by MM Steel*, 806 F.3d at 844 ("evidence that a manufacturer responded to a distributors' actual threat can show concerted action that is not independent conduct.").

addressed in this Court's decision in *MM Steel*, 806 F.3d at 848. There, this Court held that if a conspiracy involves at least one agreement between competitors and is aimed against at least one of the conspirators' competitors, the conspiracy is horizontal and retains its character as a conspiracy giving rise to *per se* liability even if there are also vertical agreements involved. *Id.* (collecting and analyzing cases). In other words, a conspiracy among competitors remains a horizontal conspiracy even if it also includes vertical agreements between suppliers.

### 1. LMC and the Cigarroa Institute formed a horizontal conspiracy that merits *per se* treatment.

Because LMC and the Cigarroa Institute compete, their agreement is a horizontal conspiracy. It was implemented through (1) a boycott by the physicians and concerted refusal to deal with DHL, and (2) threatening a DHL-recruited interventional cardiologist and convincing him not to come to Laredo.

First, LMC and the Cigarroa Institute conspired to shift Dr. Cigarroa's and Dr. Cigarroa II's practices from DHL to LMC—a boycott or concerted refusal to deal with the intent to foreclose DHL. The district court agreed that "Defendants' explicit statements constitute direct evidence of a concerted refusal to deal with DHL." ROA.6818. As the district court held, "the evidence shows that Defendants

agreed not to deal to increase their market share at the expense of DHL—indeed run them out of business" ROA.6837.[9]

Second, Dr. Cigarroa used the Cigarroa Institute's referrals to threaten Dr. Feldman and thereby prevent DHL from employing him as a new interventional cardiologist to increase output. As the district court recognized, "a reasonable jury could conclude that Dr. Cigarroa conspired with Dr. Anderson to prevent Dr. Feldman from coming to Laredo by threatening to withhold referrals from UTHSCSA." ROA.6824. That "may be called a group boycott in the strongest sense: A group of competitors threatened to withhold business from third parties unless those third parties would help them injure their directly competing rivals." *MM Steel*, 806 F.3d at 849 (quoting *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998)).

This case, then, involves a horizontal conspiracy between LMC and the Cigarroa Institute that included vertical agreements (1) between the Cigarroa Institute and its doctors to refuse to deal with DHL and (2) between the Cigarroa Institute's Dr. Cigarroa and Dr. Anderson to threaten Dr. Feldman and prevent him from working with competitor Doctors Hospital. In *MM Steel*, this Court held that

---

[9] The district court then cited caselaw on the need to show anticompetitive effects in the context of a § 2 rule-of-reason monopoly case. ROA.6837. But rule-of-reason analysis does not apply to conduct that is anticompetitive *per se*. *See* pp. 43-44, *infra*.

facts like these put the case in the heartland of "cases in which per se liability has always applied": where "members of a horizontal conspiracy use vertical agreements anticompetitively to foreclose a competitor from the market." 806 F.3d at 849. Defendants are *per se* liable for DHL's Section 1 claim.

### 2. Dr. Cigarroa's horizontal conspiracy with other doctors also merits *per se* treatment.

Further, a group boycott is subject to *per se* liability even if it involves "only one competitor" to the victim of the conspiracy where "there was a horizontal agreement among those that carried out the boycott." *MM Steel*, 806 F.3d at 849.

In *MM Steel*, this Court so held based on two Supreme Court cases. First, "in *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, the Court found it per se unlawful for manufacturers, distributors, and a retailer to agree to refuse to deal with another competing retailer." *Id.* at 848 (citing 359 U.S. 207, 209–10 (1959)). Second, in "*United States v. General Motors Corp.,* the Court held it per se unlawful for an automobile manufacturer to agree with automobile dealers to boycott other dealers that were discounting cars." *Id.* (citing 384 U.S. at 145). This Court explained that, "in *Klor's*, which remains controlling precedent, the Supreme Court applied per se liability to all of the participants in a group boycott that was arranged by only one competitor because there was a horizontal agreement among those that carried out the boycott." *Id.* at 849.

- 42 -

So too here. The conspiracy here involved at least one competitor to DHL—the Cigarroa Institute or LMC. And "there was a horizontal agreement among those that carried out the boycott," here, the Doctors Cigarroa, Dr. Feldman (under coercion), and Dr. Anderson (under coercion). *Id.*

A binding analog showing why *per se* treatment is appropriate is *Feminist Women's Health Center, Inc. v. Mohammad*, 586 F.2d 530 (5th Cir. 1978). That case, just like this one, involved a horizontal conspiracy "or concerted refusals to deal" among physicians to try to exclude the vertically-related plaintiff healthcare facility (there, a women's health clinic). *Id.* at 535, 546. There, as here, evidence showed that the doctor defendants conspired to understaff the plaintiff clinic and that the defendants' threats succeeded at preventing an out-of-town doctor from working at the plaintiff clinic. *Id.* at 535-38. Even though the clinic stayed open and indeed "flourished," such "intimidation and coercion" by horizontal conspirators aimed at a vertical relationship was enough for the Court to reverse the district court's summary judgment for the defendants on whether *per se* liability applied, and remand for a trial. *Id.* at 546-548. The same result is appropriate here.

***

Under the controlling reasoning in *MM Steel*, Defendants' conduct is illegal *per se*, which means that "no consideration is given to the intent behind the restraint,

- 43 -

to any claimed pro-competitive justifications, or to the restraint's actual effect on competition." *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 906 (6th Cir. 2003) (citing *NCAA v. Board of Regents*, 468 U.S. 85, 100 (1984)); *see N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 360 (5th Cir. 2008) ("procompetitive justifications will not be considered"); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 464-65 (3d Cir. 1998) (where *per se* analysis applies, it is "presumed" "that the combination or conspiracy produced adverse, anti-competitive effects").

## C.  The district court erred in rejecting *per se* liability.

The district court erred when it rejected *per se* liability and instead applied a rule-of-reason standard. ROA.6827-6833. To do so, the district court ignored part of the conspiracy, disregarded facts in evidence, and substituted its own analysis of the cases for the binding *MM Steel*.

### 1.  The district court erred by misframing the relevant conspiracies.

The district court found that "there is competent summary judgment evidence that Defendants engaged in concerted action to exclude Dr. Feldman, refused to deal with [DHL], and poached Dr. Santos and DHL's employees." ROA.6827. But in the very next sentence the court misstated DHL's argument as "that Defendants' refusal to deal *alone* is a *per se* unlawful group boycott." ROA.6827 (first emphasis added).

Actually, DHL had *also* focused on the threats to DHL's recruits, emphasizing that "Defendants conspired with each other *and third parties* to coerce 'suppliers' of interventional cardiology services—Dr. Cigarroa, Dr. Cigarroa II, Dr. Joaquin Cigarroa, . . . and Dr. Feldman—not to practice at Doctors Hospital." ROA.4329. The district court should have considered this evidence of a (coerced) horizontal conspiracy among competitors Drs. Cigarroa, Cigarroa II, Joaquin Cigarroa, and Feldman to boycott DHL in evaluating *per se* liability. *See* Part II.A, *supra*. This error is an independent reason to remand.

The district court also erred when it concluded that "LMC and the Cigarroa Clinic [Institute] cannot come to 'agreement . . . on the way in which they will compete with one another' for inpatient services because they are not competitors in that market." ROA.6830 (quoting *NCAA v. Board of Regents*, 468 U.S. 85, 99 (1984)). Even though LMC and the Cigarroa Institute do not compete for *inpatient* services, they do compete with each other and with DHL to provide *outpatient* services. ROA.5005-5006. This competition between LMC and the Cigarroa Institute shows their conspiracy is horizontal. *MM Steel*, 806 F.3d at 849. If the district court believed that overlooking this competition was justified because "it is the vertical relationship [between Defendants] that plays the larger role here," ROA.6830, that improperly resolves a disputed fact issue (whether inpatient or

- 45 -

outpatient interventional cardiology services are more important) against DHL. A reasonable jury is entitled on these facts to conclude that the Cigarroa Institute and LMC are horizontal competitors.

### 2. The district court improperly disregarded *MM Steel*.

The district court further misapplied *MM Steel* when it concluded that anticompetitive conduct must be purely on a horizontal plane to be considered a horizontal conspiracy subject to *per se* liability. ROA.6830 (concluding the conduct must "stem" from same "level of the market" as the co-conspirators' competitive relationship).

But *MM Steel* is clear that an overarching horizontal conspiracy can be organized "by only one competitor" to the plaintiff if "there was a horizontal agreement among those that carried out the boycott." 806 F.3d at 849. And "members of a horizontal conspiracy [can] use *vertical* agreements anticompetitively." *Id.* (emphasis added).

Here, LMC is undeniably a competitor to DHL. ROA.5005-5006. And LMC worked with an unquestioned horizontal conspiracy that included at least Dr. Cigarroa, his son, and his nephew, and also, in the wider lens, Dr. Anderson, and Dr. Feldman. *Per se* treatment is appropriate.

This Court in *MM Steel* considered and rejected the very reasoning employed by the district court in this case: "Each court that has addressed the anticompetitive nature of these group boycotts was aware of the vertical components of the conspiracy and still applied per se liability to each member of the conspiracy." 806 F.3d at 849. "In these cases, the vertical participants . . . actually join the horizontal conspiracy." *Id*. Thus, the vertical components of the horizontal conspiracy did not justify rejecting *per se* liability. *Id*. at 848-850.

The same result applies here. The horizontal conspiracy among Defendants (and Dr. Anderson and UTHSCSA, for the successful blocking of Dr. Feldman) justifies *per se* treatment even though there were "vertical components of the conspiracy." *Id*. at 849.

### 3.   *Leegin* does not change the analysis.

In a final rationale for denying *per se* treatment, the district court quoted *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 877-78 (2007), for the idea that "application of the *per se* rule 'is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if they can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason.'" ROA.6830-6831. It thus considered procompetitive benefits alleged by Defendants. ROA.6831. This was also in error.

Courts *have* had considerable experience with the restraint at issue (a horizontal boycott with vertical components) and have already concluded that the *per se* rule is appropriate, as described above. Indeed, this Court considered and rejected this very argument in *MM Steel*, where it held that *Leegin* does not overrule the settled line of cases holding that horizontal conspiracies with vertical agreements are subject to per se liability:

> [Defendant] contends that the Supreme Court limited the application of per se liability to group boycotts in *Leegin Creative Leather Products Inc. v. PSKS, Inc.* . . .. [However] [e]ach court that has addressed the anticompetitive nature of these group boycotts was aware of the vertical components of the conspiracy and still applied per se liability to each member of the conspiracy. . . .. *We decline to hold that the Supreme Court silently overruled this line of cases . . ..*

806 F.3d at 848-49 (emphasis added, citations omitted). And because *per se* analysis applies, "procompetitive justifications will not be considered." *N. Tex. Specialty Physicians*, 528 F.3d at 360. The district court cited two cases, but neither one changes the analysis. ROA.6828-6829 (citing *Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 298 (1985), and *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986)). This Court's *MM Steel* decision expressly considered those cases and concluded they have "no bearing" on claims that do "not involve a cooperative or a professional organization." *MM Steel*, 806 F.3d at 848 n.7 (rejecting application on this basis).

- 48 -

In short, this Court's precedent requires horizontal conspirators to be *per se* liable for a § 1 violation, so the summary judgment on this claim should be reversed and remanded for trial.[10]

The Court can and should end its analysis here and remand both claims under § 1 and § 2, as neither one requires any showing of actual anticompetitive effects. But to remove all doubt that reversal is required, it bears mention that the evidence fully showed triable issues of fact regarding the predatory conduct's actual anticompetitive effects. Thus, under any standard, this case should go to a jury.

In fact, while "actual effects are not by themselves necessary to sustain an attempted monopolization claim" under § 2, they "might be relevant to determining [the conduct's] predatory nature, the defendant's intent, or the state of the market." *Jostens*, 216 F.3d at 475. Thus, the actual effects evidence makes reversal and remand for trial doubly sound.

---

[10] The district court also considered and rejected *per se* treatment under the factors this Court enumerated in *Tunica*, 496 F.3d at 414-15. ROA.6831-32. DHL does not appeal that part of the district court's reasoning. Because *Tunica* is only an alternative route to *per se* liability, this Court can apply *per se* liability under *MM Steel* without addressing the *Tunica* factors. *See* ROA.6831 (recognizing *Tunica* is an "alternative" argument); *MM Steel*, 806 F.3d at 850 (holding that "the *Tunica* decision does not affect our above holding that the per se rule applies to the group boycott alleged in this case.").

**D.    In any event, the district court erred when it concluded that DHL had not offered sufficient evidence to satisfy the rule of reason.**

Where a § 1 violation is not illegal per se, courts test whether the conduct is anticompetitive under the rule of reason. "The rule-of-reason inquiry uses a burden shifting framework." *Impax Labs., Inc. v. FTC*, 994 F.3d 484, 492 (5th Cir. 2021) (citing *Ohio v. Am. Express*, 585 U.S. 529, 541 (2018)). The plaintiff has the "initial burden . . . to show anticompetitive effects," after which "the burden shifts to [defendants] to demonstrate that the restraint produced procompetitive benefits." *Id.* at 492 (citing *Am. Express*, 585 U.S. at 541). If defendants do so, the plaintiff "can demonstrate that any procompetitive effects could be achieved through less anticompetitive means" or the factfinder "must balance the anticompetitive and procompetitive effects of the restraint." *Id.* (citation omitted). "If the anticompetitive harms outweigh the procompetitive benefits, then the agreement is illegal." *Id.* (citation omitted). "Under a rule of reason analysis, the factfinder considers all of the circumstances to determine whether a restrictive practice imposes an unreasonable restraint on competition." *Marucci Sports*, 751 F.3d at 374 (citation omitted).

Here, the district court analyzed and granted summary judgment only on the first step of this test—concluding that "a reasonable jury could not find

[Defendants'] conduct caused anticompetitive effects." ROA.6833.[11] But DHL showed anticompetitive effects via direct and indirect evidence of the market structure, care delays, decreased procedure counts, and raised costs. Granting summary judgment in the face of this evidence resulted from a misapplication of law and failure to consider the evidence in the light most favorable to the plaintiff. These errors each justify reversal and remand.

### 1. DHL showed anticompetitive effects via market structure evidence.

The district court erred by requiring DHL to show anticompetitive effects via "direct evidence" of "actual detrimental effects" or consumer harm, rather than allowing DHL to show anticompetitive effects via "indirect evidence" such as "proof of market power plus some evidence that the challenged restraint harms competition." *See Am. Express*, 585 U.S. at 542. In the recent *FTC v. Meta Platforms, Inc.* case, Judge Boasberg rejected conflating "the need to demonstrate 'anticompetitive effects' with the need to demonstrate an impact on consumer welfare." 2024 WL 4772423, at *23-24 (D.D.C. Nov. 13, 2024). Instead, the analysis "focus[es]" on the "effect on competitive structure." *Id.* at *26 (quotation

---

[11] While the district court acknowledged that Defendants had alleged procompetitive benefits from the LMC-Cigarroa agreement, it did so only to address *whether* to apply the rule-of-reason test, rather than while applying the rule-of-reason test. ROA.6832.

omitted). "Eliminating potential competition is, by definition, anticompetitive." *Impax*, 994 F.3d at 493.

Under the correct standard, DHL's evidence that the Cigarroa Institute had market power and blocked Dr. Feldman is enough. The Cigarroa Institute had market power in three ways. First, a share of 71%-76% of the relevant market "is sufficient to establish a monopoly power." *Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964, 981 (5th Cir. 1977) (affirming jury verdict for plaintiff). Together, Defendants account for over 70% of interventional cardiology procedures in 2021 and 2022. ROA.6289.

Second, market concentration also supports market power. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 492 (5th Cir. 1984). Here, Dr. Pflum opined that the market is "highly concentrated." ROA.6287; ROA.6291.

And finally, "high barriers to entry," including high capital costs and entrenched buyer preferences, can also show market power. *Domed Stadium*, 732 F.2d at 490; *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997); *see Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 529 n. 12 (5th Cir. 1982) ("recognized or extensively advertised" brand name barrier to entry). Here, both high capital costs (e.g., the need for cardiac catheterization labs) and entrenched buyer preferences (via referrals) are present. ROA.6293-6299.

Given that backdrop of market power evidence, the evidence that the Cigarroa Institute blocked Dr. Feldman, thereby eliminating a potential competitor and perpetuating the shortage of interventional cardiologists in Laredo, was enough to establish a genuine dispute of material fact on anticompetitive effects. The district court's failure to address this evidence warrants remand.

### 2. DHL showed anticompetitive effects via care delay evidence.

Further, the district court disregarded DHL's "direct" evidence that blocking Dr. Feldman harmed patients by worsening heart attack call response times and derailing DHL's planned structural heart program.

Because Laredo does not have enough interventional cardiologists, there is a "delay in response" to heart attack call. ROA.4564. In one instance, that delay led to a patient death. ROA.4559-60. This harm was perpetuated by blocking Dr. Feldman from joining DHL, because doing so "restricte[d] the supply of interventional cardiology services." ROA.6839-6840 (alteration in original). DHL explained this point repeatedly—ROA.4204; ROA.4208; ROA.4256-4257—and yet the district court improperly ignored the record and concluded that there was no evidence that the Cigarroa Institute's conduct harmed patients. ROA.6839-6842.

The district court also improperly disregarded DHL's cited evidence of the planned structural heart program, characterizing it as speculative:

> Likewise with . . . the structural heart program that DHL would build—even with Ms. Montes-Ewing's testimony about potential plans, the record does not contain evidence that any . . . program could have been established. Speculation does not create fact issues, and 'speculation about anticompetitive effects is not enough' to show market injury.

ROA.6842 (quoting *Marucci Sports*, 751 F.3d at 376).

The district court did not acknowledge the summer 2021 emails between DHL's CEO, Ms. Montes-Ewing, and Drs. Feldman and Cilingiroglu planning to start a program "for Q2 or Q3 of 2022, perhaps sooner." ROA.4806-4807. Nor did the district court address that Dr. Cilingiroglu had started a structural heart program before and was beginning to approach equipment manufacturers. ROA.4788-4789; ROA.4791-4792. This is a far cry from the unsupported "speculati[on]" in pleadings addressed by *Marucci Sports*, 751 F.3d at 376. Here, the evidence shows a fact dispute about whether a structural program could have been established.

And in an unchallenged part of his proposed opinion, DHL's expert Dr. Pflum concluded that delaying the planned structural program harmed patients. ROA.6536-6537. Without the program, patients have to travel to San Antonio. ROA.6536-6537. This is a core antitrust harm. *See AmEx*, 585 U.S. at 542 (direct evidence of harm includes "decreased quality"). Yet *sua sponte* and without citing anything, the district court dismissed this well-evidenced harm as speculative—improperly drawing inferences against DHL. ROA.6842. This also justifies remand.

### 3. DHL showed anticompetitive effects via decreased procedure counts.

The district court disregarded DHL's evidence that overall cardiology procedure volume had decreased. ROA.6614, Sealed ROA.8721. Decreased output is also a core antitrust harm. *See Am. Express*, 585 U.S. at 542 (direct evidence of harm includes "reduced output"). The district court recognized this decrease in its statement of facts: "the data shows that 'overall interventional cardiology procedure volume has *declined* since 2019.'" ROA.6802. Sealed ROA.8721. But the district court overlooked the decrease when evaluating harms. ROA.6839-6842. This evidence independently justifies remand. *See Shields v. World Aquatics*, 2024 WL 4211477, at *3 (9th Cir. Sept. 17, 2024) (reversing summary judgment under rule-of-reason because factfinder could conclude that Defendants' conduct had decreased output).

### 4. DHL showed anticompetitive effects via higher costs and patient harm.

The district court erred when it analyzed the LMC-Cigarroa agreement separately, hiving it off from the other conduct. ROA.6834-6842.

Conspiracies are evaluated "as a whole" rather than "dismember[ed]" into "separate parts" or separate agreements. *Cont'l Ore*, 370 U.S. at 699 (reversing summary judgment that analyzed agreements individually and, on that basis, found that no single one of the agreements could establish liability).

A conspiracy can cause anticompetitive effects even if individual components are legal: "The plan may make the parts unlawful." *Swift & Co. v. United States*, 196 U.S. 375, 396 (1905). To support cutting up the conspiracy, the district court cited *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337 (4th Cir. 2024). ROA.6834. But *Duke Energy* is a § 2 case, not a § 1 case. *Duke*, 111 F.4th at 353. Section 1 case conspiracies must be considered as a whole.

Dr. Pflum opined that the overall scheme "is consistent with a raising rivals' costs (RRC) strategy by which a firm attempts to gain or maintain market share by imposing additional costs on rivals that make it more difficult for those rivals to compete." *See* ROA.6530. Dr. Pflum explained that this strategy has harmed "the competitive process" and "has harmed patients." ROA.6609; ROA.5896-97; ROA.6310. This Court recognizes that raising rivals' costs can be anticompetitive and constitute antitrust harm. While this Court has reserved judgment of "raised costs as a standalone theory" (as the district court below pointed out), the Court did not "doubt that raised costs can be a form of antitrust injury in cases where the defendant has *already* violated antitrust law in some other way." *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 529 n.4 (5th Cir. 2022). Thus, here, where the Cigarroa Institute had *already* violated antitrust law via the exclusionary threat against Dr. Feldman, "raised costs can be a form of antitrust injury." *Id.*

But the district court drew inferences against DHL on the higher costs from locums tenens doctors. "Locums tenens" means "to hold the place of," and these short-term contract doctors are intended as stop-gap solutions. ROA.4292-4293. In May 2022, DHL contracted with "locums tenens" doctors because it had been unable to recruit a permanent interventional heart doctor after eight more months of searching. ROA.5000; ROA.4585-4587. Locums tenens doctors are qualified but temporary and more expensive than permanent doctors. ROA.4292-4293.

Locums tenens doctors' short-term time frame and higher expense are both problematic. DHL expert Dr. Pflum opined that the difference between what DHL paid locums tenens doctors and what it would have paid Dr. Feldman damaged DHL in an amount over $440,000. ROA.6312-6314.[12] And from a patient's perspective, locums tenens doctors are inferior to permanent doctors because they offer less continuous care. ROA.4293; ROA.4568.

The district court drew inferences against DHL to dismiss these harms, erring in two ways. First, according to the district court, both (a) that DHL "w[as] able to hire additional cardiologists and locums tenens" and (b) that "no locums physicians were hired for months after Dr. Feldman turned down DHL's offer" showed a lack

---

[12] This number is conservative: DHL's search for a permanent interventional cardiologist continued after August 2023, showing that DHL continues to be harmed. ROA.5000. And Dr. Cilingiroglu has since left and Dr. Diaz is "almost semiretired." ROA.4524; ROA.4517.

- 57 -

of harm to DHL's finances. ROA.6840-41. But drawing reasonable inferences for DHL suggests the opposite: that DHL was trying—and failing—to recruit a full-time physician for more than a year shows a fact dispute on whether the Cigarroas heightened the already-high barriers to entry and hurt competition.

That DHL ultimately managed to hire some locums tenens doctors at higher costs does not eliminate the previous months' harm from the shortage, nor does it change the ongoing harm from the heightened costs. Even if an anticompetitive conspiracy "does not look anticompetitive in hindsight," the "impact of an agreement on competition is assessed as of 'the time it was adopted.'" *Impax*, 994 F.3d at 496 (quoting *Polk Bros v. Forest City Enters.*, 776 F.2d 185, 189 (7th Cir. 1985) (Easterbrook, J.)) (affirming finding of anticompetitive effects).

Second, the district court dismissed the idea that locums tenens doctors harmed patients because "Dr. Pflum did not conclude that patient care was negatively impacted by locums, only that it 'may' be." ROA.6841. Actually, Dr. Pflum concluded that DHL's use of locums tenens doctors "has harmed patients in several ways." ROA.6609; ROA.5896-97; ROA.6310.

Specifically, as DHL cited to the district court, Dr. Pflum explained that "the use of locums tenens to provide cardiology care is associated with diminished continuity of care. That is, by relying on a rotating set of locums, some patients would

have been denied the ability to develop a physician-patient relationship with the interventional cardiologist that treated them." ROA.6310-6311 (footnote omitted), *cited by* ROA.4246. This is a second way that the district court misread the record and improperly drew inferences against DHL. *See In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 735 (8th Cir. 2014) (reversing summary judgment where district court "appear[ed] to have weighed the evidence, questioning the conclusions of [plaintiff's] expert").

The evidence of harm from the hiring of locums tenens physicians independently justifies remand.

## III.  A Reasonable Jury Could Find Antitrust Injury.

DHL has shown that material fact disputes exist on antitrust violations under both § 1 and § 2, so it has also shown a material fact dispute on antitrust injury. The district court concluded that there was no antitrust injury based on the notion that the evidence did not show antitrust violations. ROA.6812-6813. If this Court reverses either claim, it should also conclude the evidence shows an antitrust injury or remand for the district court to do so.

The standard for proving an antitrust injury is low. An antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat,*

*Inc.*, 429 U.S. 477, 489 (1977). Courts assessing antitrust injury "assume *arguendo*" that conduct "violates the antitrust laws." *Pulse Network*, 30 F.4th at 488.

In *Doctors Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, this Court held that a plaintiff hospital excluded by a defendant competitor hospital had antitrust injury. 123 F.3d 301, 306 (5th Cir. 1997). There, the plaintiff hospital alleged that the defendant hospital had used its monopoly power to convince another defendant, a PPO, to exclude the plaintiff hospital from joining the PPO, thereby weakening competition and leading the plaintiff hospital to lose revenue. *Id.* at 304-05. Assuming the agreement was unlawful, as it had to, this Court held that the injury—lost revenue from being excluded—"flows from the allegedly exclusionary conduct of its competitor . . . and is exactly the kind of anticompetitive effect that [the defendant hospital] sought." *Id.* at 306. "[E]xcluded competitor" cases are "'classical' antitrust cases." *Id.*

This is just such a "classical" case. Defendants recognized that DHL's recruiting threatened their conspiracy to monopolize the Laredo market. ROA.6150. To protect and increase its power, the Cigarroa Institute used its control over referrals to block Dr. Feldman from joining DHL and shifted its practice to LMC, conduct which this Court must assume is anticompetitive. *See* pp. 9-13, *supra.*

Because of Dr. Feldman's exclusion, DHL indeed lost market share, and patients in Laredo more generally had fewer doctors from which to choose, which is classically recognized as an antitrust injury because it affects the quality of consumer experiences. ROA.6303-6311; ROA.6289-6291; ROA.6295-6297; ROA.6102-6108; Sealed ROA.8716-8722. Because of the overall scheme, DHL has not started a structural heart program and has had to pay the higher cost of locums tenens doctors. *See* ROA.6303-6314.

That is all DHL needs to establish antitrust injury. As the district court acknowledged, "antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing." *See* ROA.6843 n.42 (citing *Doctor's Hosp.*, 123 F.3d at 305, *Walker v. U-Haul Co. of Miss.*, 747 F.2d 1011, 1013 (5th Cir. 1984)). A plaintiff need only show some evidence of a single loss to itself (*e.g.* "the opportunity to compete for business from at least one major merchant") resulting from conduct "designed to" "lock up the market and thereby protect" defendants and "hurt [a plaintiff's] market share." *Pulse*, 30 F.4th at 494-95 & nn. 20, 24; *see Multiflex*, 709 F.2d at 995 (affirming antitrust injury after concluding that plaintiff harmed by defendant's conduct that "interfered with the ultimate customers' free choice in the marketplace"); *BRFHH Shreveport*, 49 F.4th at 529 n.4 (higher costs can be antitrust injury). DHL has shown antitrust injury.

## CONCLUSION

This Court should reverse the order granting summary judgment and remand for trial. Alternatively, it should vacate the summary judgment order and remand for reconsideration. Appellants pray for all other relief to which they are justly entitled.

Dated: July 16, 2025

Respectfully submitted,

/s/ *Constance H. Pfeiffer*

Constance H. Pfeiffer
Bryce L. Callahan
Justin S. Rowinsky
Katherine S. Dannenmaier
**YETTER COLEMAN LLP**
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
cpfeiffer@yettercoleman.com
bcallahan@yettercoleman.com
jrowinsky@yettercoleman.com
kdannenmaier@yettercoleman.com

*Attorneys for Appellants*
*Doctors Hospital of Laredo and*
*Laredo Physicians Group*

**CERTIFICATE OF SERVICE**

I certify that this document was filed with the Court via the court's electronic filing system, on the 16th day of July, 2025, and an electronic copy of this document was served on all counsel of record, as listed below, via the court's electronic filing system on the same date:

Peter D. Kennedy
**GRAVES DOUGHERTY HEARON & MOODY PC**
401 Congress Avenue, Suite 2700
Austin, Texas 78701
pkennedy@gdhm.com

Stacy R. Obenhaus
**FOLEY & LARDNER LLP**
2021 McKinney Avenue
Dallas, Texas 75201
sobenhaus@foley.com

Jason M. Powers
**VINSON & ELKINS LLP**
Texas Tower
845 Texas Avenue, Suite 4700
Houston, Texas 77002
jpowers@velaw.com

James G. Munisteri
**FOLEY & LARDNER LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
jmunisteri@foley.com

*Counsel for Appellees/Cross-Appellants Dr. Ricardo Cigarroa; Cigarroa Heart and Vascular Institute*

*Counsel for Defendant/Appellee Laredo Texas Hospital Company, L.P., doing business as Laredo Medical Center*

/s/ *Constance H. Pfeiffer*
Constance H. Pfeiffer

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this document contains 12,891 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Office Word 2016 in 14-Point Equity A font.

Date:    July 16, 2025                          /s/ *Constance H. Pfeiffer*
                                                Constance H. Pfeiffer