No. 25-50153

_____

United States Court of Appeals
Fifth Circuit

_____

DOCTORS HOSPITAL OF LAREDO; LAREDO PHYSICIANS GROUP,
Plaintiffs - Appellants/Cross-Appellees,

v.

DR. RICARDO CIGARROA; CIGARROA HEART AND VASCULAR
INSTITUTE,
Defendants - Appellees/Cross-Appellants,

LAREDO TEXAS HOSPITAL COMPANY, L.P.,
doing business as Laredo Medical Center,
Defendant – Appellee.

_____

Appeal from the U.S. District Court, Western District of Texas
No. 5:21-CV-1068

_____

# Brief of Appellee Laredo Texas Hospital Company LP and Appellees/Cross-Appellants Dr. Ricardo Cigarroa and Laredo Cardiovascular Consultants P.A.

_____

James G. Munisteri
jmunisteri@foley.com
Stacy R. Obenhaus
sobenhaus@foley.com
Thomas Leonard
tleonard@foley.com
Foley & Lardner LLP
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel:    713.276.5500

For Laredo Texas Hospital Company LP

Jason M. Powers
jpowers@velaw.com
James L. Leader, Jr.
jleader@velaw.com
Vinson & Elkins LLP
1001 Fannin Street, Suite 2500
Houston, Texas 77002-6760
Tel: 713.758.2522

For Dr. Ricardo Cigarroa and Laredo
Cardiovascular Consultants PA d/b/a
Cigarroa Heart and Vascular Institute

## Certificate of Interested Parties

The undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Plaintiffs: | Counsel: |
|---|---|
| Doctor's Hospital of Laredo<br>Laredo Physicians Group | Constance H. Pfeiffer<br>Bryce L. Callahan<br>Justin Rowinsky<br>Katherine Dannenmaier<br>James E. Zucker<br>    Yetter Coleman LLP |

| Defendants: | Counsel: |
|---|---|
| Dr. Ricardo Cigarroa<br>Laredo Cardiovascular Consultants<br>    P.A. d/b/a Cigarroa Heart and<br>    Vascular Institute | Jason Michael Powers<br>James Lewis Leader, Jr.<br>Ryan Yang Sun<br>    Vinson & Elkins LLP<br>Peter D. Kennedy<br>Guillermo A. Alarcon<br>    Graves Dougherty Hearon &<br>    Moody PC<br>Martha Louise Cigarroa<br>Steve A. Whitworth<br>    Whitworth Cigarroa PLLC |

| Defendant: | Counsel: |
|---|---|
| Laredo Texas Hospital Company LP<br>(dba Laredo Medical Center)<br>Laredo Physician Associates | James G. Munisteri<br>Stacy R. Obenhaus<br>Thomas A. Leonard<br>    Foley & Lardner LLP |

| | |
|---|---|
| */s/ Stacy R. Obenhaus*<br>Counsel for<br>Laredo Texas Hospital Company LP | */s/ Jason M. Powers*<br>Counsel for Laredo Cardiovascular<br>Consultants P.A. and Dr. Ricardo<br>Cigarroa |

2

## Statement Regarding Oral Argument

Given this lawsuit's technical subject matter, wide-ranging allegations, and extensive summary judgment record, oral argument may aid this Court.

# Table of Contents

Certificate of Interested Parties.......................................................................... 2

Statement Regarding Oral Argument.................................................................. 3

Table of Contents ............................................................................................... 4

Table of Authorities............................................................................................ 7

Statement of Jurisdiction................................................................................... 11

Statement of Issues ...........................................................................................12

    A.    Plaintiffs' appeal. ................................................................................12

    B.    Cigarroa defendants' cross-appeal...................................................12

Statement of the Case....................................................................................... 13

    I.    Introduction ........................................................................................ 13

    II.    Statement Of Facts. .......................................................................... 15

    A.    The parties and services at issue.................................................... 15

    B.    The market changed when Cigarroa started his own outpatient facility to better serve patients. .................................. 17

    C.    In 2020, DHL sought to reassert control over the market with a new hospital-controlled, itinerant-physician model........ 18

    D.    While DHL alienated independent doctors, LMC welcomed them with investments in facilities and staff. ...........................21

    E.    Dr. Cigarroa and Dr. Santos, unwanted by DHL, announced their moves to LMC............................................... 22

    F.    DHL could still recruit interventional cardiologists. .................. 24

    G.    No evidence of conspiracy or competitive harm could be found in DHL's speculative allegations about Feldman. ........... 25

H.     The interventional cardiology market in Laredo has ample competition.................................................................28

III.   Procedural History And Rulings Presented For Review. ................31

Summary of Argument......................................................................... 33

Argument – Plaintiffs' Appeal............................................................. 36

I.      The Summary Judgment Standard Of Review Is De Novo. ........... 36

II.    The Summary Judgment Proof Demonstrates DHL Cannot Prove Competitive Harm Or Antitrust Injury. ............................. 36

    A.    Defendants' conduct did not impact prices: there were more doctors performing more procedures at more facilities.................................................................. 37

    B.    DHL did not prove anticompetitive effects. .............................. 39

III.   DHL Raised No Fact Question On Its Sherman Act § 1 Claim. ......................................................................................48

    A.    The Cigarroa-LMC alignment is a mixed vertical and horizontal relationship with procompetitive benefits. ............... 48

    B.    The Cigarroa - LMC alignment did not invoke Sherman Act section 1 per se liability............................................... 49

    C.    Because there was no evidence of anticompetitive effect, DHL had no claim under the rule of reason. .............................. 59

IV.   DHL Raised No Fact Question On Its Sherman Act § 2 Claim Of Attempted Monopolization. .................................................... 59

    A.    DHL did not demonstrate a dangerous probability the defendants could attain market power. .......................................60

    B.    DHL did not demonstrate exclusionary conduct.........................61

V.    DHL Has No Antitrust Injury And Raised No Fact Issue On An Antitrust Claim. ................................................................... 67

    A.    DHL is not an excluded competitor............................................68

B.    Courts reject the notion that a single physician's exclusion demonstrates a harm to competition. ........................ 70

Argument – Cigarroa Defendants' Cross-Appeal ........................ 73

I.    A Ruling On A Rule 12(b)(6) Motion Is Reviewed De Novo. ......... 73

II.    If This Court Reverses The Ruling On DHL's Claims It Must Reverse The Ruling On The Cigarroa Defendants' Claim. ............. 74

A.    The counterclaim plausibly alleged that DHL filed suit to maintain a monopoly and therefore harmed the Cigarroa defendants. ........................ 76

B.    The counterclaim had plausible allegations that DHL's lawsuit was a sham based on misrepresentations. ...................... 78

C.    If DHL may pursue an antitrust claim regarding the alleged exclusion of Feldman, the Cigarroa defendants may pursue their claim regarding exclusion of Santos. ................................ 81

Conclusion ........................ 83

Certificate of Compliance ........................ 84

# Table of Authorities

## Cases

*Acoustic Sys., Inc. v. Wenger Corp.*
  207 F.3d 287 (5th Cir. 2000)....................................................................80

*Benson v. St. Joseph Regional Health Ctr.*
  575 F.3d 542 (5th Cir. 2009) ................................................................71

*BRFHH Shreveport LLC v. Willis-Knighton Medical Center*
  49 F.4th 520 (5th Cir. 2022)....................................................... 46, 47

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*
  429 U.S. 477 (1977).................................................................... 68, 72

*Celotex Corp. v. Catrett*
  477 U.S. 317 (1986) .......................................................................... 36

*Chrysler Credit Corp. v. J. Truett Payne Co.*
  670 F.2d 575 (5th Cir. 1982).....................................................68

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*
  123 F.3d 301 (5th Cir. 1997)............................................... 68, 69

*Domed Stadium Hotel Inc. v. Holiday Inns, Inc.*
  732 F.2d 480 (5th Cir. 1984) ..............................................................40

*Eisiai, Inc. v. Sanofi Aventis U.S., LLC*
  821 F.3d 394 (3rd Cir. 2016) ......................................................70

*Fashion Originators' Guild of America, Inc. v. FTC*
  312 U.S. 457 (1941) ..........................................................................50

*Feminist Women's Health Center, Inc. v. Mohammad*
  586 F.2d 530 (5th Cir. 1978) ........................................... 58, 59

*FTC v. Super. Ct. Trial Lawyers' Ass'n*
  493 U.S. 411 (1990).......................................................................50

*FTC v. ZAAPPAAZ, LLC*
  140 F.4th 675 (5th Cir. 2025) ...........................................................36

7

*Gabarick v. Laurin Mar. (Am.) Inc.*
753 F.3d 550 (5th Cir. 2014) ...................................................................... 78

*Heatransfer Corp. v. Volkswagenwerk, A.G.*
553 F.2d 964 (5th Cir. 1977) ...................................................................... 41

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*
125 F.3d 1195 (9th Cir. 1997) .................................................................... 40

*Impax Laboratories, Inc. v. FTC*
994 F.3d 484 (5th Cir. 2021) ...................................................................... 59

*Jebaco, Inc. v. Harrah's Operating Co.*
587 F.3d 314 (5th Cir. 2009) ...................................................................... 69

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*
359 U.S. 207 (1959) ..................................................................................... 50

*Liberty Lake Investments, Inc. v. Magnuson*
12 F.3d 155 (9th Cir. 1993) ........................................................................ 80

*Marucci Sports v. NCAA*
751 F.3d 368 (5th Cir. 2014) ................................................................ 71, 73

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574 (1986) ..................................................................................... 36

*McFaul v. Valenzuela*
684 F.3d 564 (5th Cir. 2012) ...................................................................... 36

*Mercatus Grp. LLC v. Lake Forest Hosp.*
641 F.3d 834 (7th Cir. 2011) ...................................................................... 80

*MM Steel LP v. JSW Steel (USA) Inc.*
806 F.3d 835 (5th Cir. 2015) ...................................................... 50, 54, 55

*Multiflex, Inc. v. Samuel Moore & Co.*
709 F.2d 980 (5th Cir. 1983) ................................................................ 62, 63

*Nw. Wholesale Stationers v. Pac. Stationery & Printing Co.*
472 U.S. 284 (1985) ........................................................................ 50, 51, 52

*NYNEX Corp. v. Discon, Inc.*
525 U.S. 128 (1998) ................................................................................ 50, 51

*Pisharodi v. Columbia Valley Healthcare Sys. LP*
  No. 1:14-CV-0004, 2015 WL 11123315 (S.D. Tex. Jan. 29, 2015),
  615 F. App'x 225 (5th Cir. 2015) ..............................................................71

*Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*
  508 U.S. 49 (1993) ................................................................................ 79

*Pulse Network LLC v. Visa, Inc.*
  30 F.4th 480 (5th Cir. 2022) ........................................................ 67, 70

*Spectrum Sports, Inc. v. McQuillan*
  506 U.S. 447 (1993) ....................................................................59, 61, 76

*Taylor Pub. Co. v. Jostens, Inc.*
  216 F.3d 465 (5th Cir. 2000) .........................................................passim

*Taylor v. Christus St. Joseph Health Sys.*
  216 F. App'x 410 (5th Cir. 2007)...................................................71

*United States v. American Airlines, Inc.*
  743 F.2d 1114 (5th Cir. 1984) ...................................................... 41, 61

*United States v. E.I. du Pont de Nemours & Co.*
  351 U.S. 377 (1956) ..............................................................................60

*United States v. Microsoft Corp.*
  253 F.3d 34 (D.C. Cir. 2001)...................................................... 65, 66

*United States v. U.S. Steel Corp.*
  251 U.S. 417 (1920) ..............................................................................40

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko*
  *LLC*, 540 U.S. 398 (2003) ............................................................. 64, 65

*Wampler v. Sw. Bell Tel. Co.*
  597 F.3d 741 (5th Cir. 2010) ...................................................... 73

*Whelan v. Abell*
  48 F.3d 1247 (D.C. Cir. 1995) ..........................................................80

*Woods Expl. & Prod. Co. v. Aluminum Co. of Am.*
  438 F.2d 1286 (5th Cir. 1971) ..........................................................80

## Statutes

15 U.S.C. §§ 1-2 ............................................................... 11, 12 passim

28 U.S.C. § 1291 ...................................................................... 11

28 U.S.C. § 1331 ...................................................................... 11

28 U.S.C. § 1337 ...................................................................... 11

28 U.S.C. § 1367 ...................................................................... 11

## Rules

Fed. R. App. P. 4(a) ................................................................ 11

Fed. R. Civ. P. 54(b) ............................................................... 11

Fed. R. Civ. P. 56(a) ............................................................... 36

## Other Authorities

P. Areeda & H. Hovenkamp, Antitrust Law: Analysis of Antitrust
Principles and Their Application § 651 (2022) ...................................... 47

P. Areeda & H. Hovenkamp, Antitrust Law: Analysis of Antitrust
Principles and Their Application (CCH) § 651b5 (May 2025) ................. 47

P. Areeda & H. Hovenkamp, Antitrust Law: Analysis of Antitrust
Principles and Their Application (CCH) § 2204c (May 2025) ............... 52

## Statement of Jurisdiction

Plaintiffs filed claims alleging violations of the Sherman Act, 15 U.S.C. §§ 1-2, and state law claims for tortious interference (ROA.52-83, 212-57). Subject matter jurisdiction exists under 28 U.S.C. §§ 1331, 1337, 1367.

Early in the lawsuit, the district court dismissed the plaintiffs' claim for tortious interference and then later on dismissed the Cigarroa defendants' counterclaim (ROA.901-39, 1979-99, 3291-3307). On January 28, 2025, the court granted a summary judgment dismissing plaintiffs' remaining claims (ROA.6781-6848). That ruling is the final judgment. Fed. R. Civ. P. 54(b).

On February 26, 2025, plaintiffs appealed (ROA.6875-76). On March 6, 2025, the Cigarroa defendants appealed (ROA.6924-26). This Court has jurisdiction under 28 U.S.C. § 1291. Fed. R. App. P. 4(a).

# Statement of Issues

### A.  Plaintiffs' appeal.

1.      Did plaintiffs' summary judgment proof support a claim under Sherman Act § 1? Specifically, was there proof that the challenged conduct (a) was a per se violation of Sherman Act § 1, or (b) caused anticompetitive effects in the market for interventional cardiology services in Laredo, Texas?

2.      Did plaintiffs' summary judgment proof support a claim under Sherman Act § 2, i.e., did the plaintiffs prove exclusionary conduct and a dangerous probability of the defendants achieving monopoly power?

3.      Did the plaintiffs offer proof of antitrust injury, i.e., an injury of the type antitrust laws were intended to protect and that flows from that which makes defendants' conduct allegedly unlawful?

### B.  Cigarroa defendants' cross-appeal.

4.      Did the Cigarroa defendants' counterclaim state a claim for relief for attempted monopolization in violation of Sherman Act § 2?

## Statement of the Case

### I.   INTRODUCTION

The district court correctly ruled that doctors' decisions about where they practice medicine do not violate antitrust laws when the decisions have no measurable or projected impact on competition.

Ironically, this antitrust lawsuit was brought by a competitor seeking to blunt competition. Doctors Hospital of Laredo (DHL), part of a $15 billion international health system, was for years the leading heart care provider in Laredo, Texas, and home to the city's only cardiovascular surgeon. But DHL resented that independent cardiologists with privileges at DHL sometimes performed procedures at the other hospital in town, Laredo Medical Center (LMC). That resentment boiled over when one independent—third-generation Laredo physician Dr. Ricardo Cigarroa—opened his own outpatient facility at the Cigarroa Heart & Vascular Institute as an alternative to DHL's aging, cramped quarters.

At first, DHL tried to buy out its new competition, offering to acquire part of the Cigarroa Institute. When Cigarroa demurred, DHL developed a new strategy: pivot away from the independent cardiologists on its staff and move toward corporate-employed cardiologists to capture the independents' procedures and keep revenues within DHL's corporate family.

Cigarroa, who had treated patients in DHL's hospital and emergency room for years, saw the writing on the wall for DHL's independent physicians. Looking for more welcoming environs, Cigarroa offered to make LMC his practice home if the hospital would take steps to become a more serious competitor in Laredo cardiology. LMC responded, upgrading its catheterization labs and expanding its nursing and surgical teams. The result was a more competitive environment. Laredo now has **two** hospitals offering robust cardiology-cardiovascular surgery services, plus a physician-owned outpatient facility for interventional cardiology.

DHL sued, claiming that Cigarroa and LMC conspired to prevent DHL from competing. But the uncontested summary judgment evidence showed DHL was never "left in a lurch" or prevented from offering interventional cardiology services in Laredo: DHL successfully recruited from a national pool of cardiologists, had its own cardiovascular surgeons, and had the on-call doctors it needed for its emergency room. DHL complained that LMC and Cigarroa hoped to out-compete DHL and that Cigarroa criticized DHL's prospective hires in staff meetings, but the district court—even after indulging DHL's conspiracy claims—concluded these arguments were immaterial because the alleged conduct did not affect the market: DHL's cardiology practice continued; market output grew; and there was no impact

14

on prices or quality of care. In its quest to capture all of Laredo's cardiology work for itself, DHL inadvertently jump-started the competition—a result that was good for consumers but not DHL.

After extensive discovery and expert analysis, DHL offered no evidence creating a genuine issue as to an essential element of its antitrust claims: that the defendants' alleged conduct harmed competition in Laredo or had the potential to do so. When DHL shunned independent doctors in favor of its own new team, many patients chose to follow the independents. But that is competition; antitrust law protects competition, not individual competitors like DHL. The evidence established that the defendants' conduct increased competition, increased consumer choice, and had no adverse effects on prices or output—and thus did not violate antitrust law.

## II.   STATEMENT OF FACTS.

## A.   The parties and services at issue.

This brief discusses multiple heart-related treatments, including:

- "General" or "medical" cardiology (e.g., monitoring, behavioral care, and drugs), which may be provided by a general cardiologist or an interventional cardiologist, typically in an office/clinic setting.

- Interventional cardiology procedures (catheter-based treatments to open clogged arteries with balloons and stents), which must be performed by interventional cardiologists in a catheterization lab

("cath lab") either on an inpatient basis (i.e., while admitted to a hospital) or an outpatient basis (in a hospital or a surgical center).

- Cardiovascular (e.g., open-heart) surgery, which must be performed by a cardiothoracic surgeon in a hospital.

- Structural cardiology procedures (e.g., heart-valve replacement), which are performed jointly by a cardiovascular surgeon and a structural interventional cardiologist in hospitals with specialized operating rooms.

(ROA.2732, 2837-39, 7740-41, 7637-43, 7745 [¶¶ 23-25, 41-44]). In all cases, heart patients are served by both a physician (a cardiologist or surgeon) and by a facility (a hospital or surgical center, together with its technicians and nurses) (ROA.7638-39).

DHL and LMC are the only two Laredo hospitals offering inpatient interventional cardiology services (ROA.219 [¶ 34]), including treating heart attacks known as ST-elevation myocardial infarctions (STEMIs) (ROA.3140, 4287-89). These two hospitals have sufficient capacity to handle the load of STEMI patients in Laredo (ROA.7581).

Most interventional procedures are not emergencies, however. Many are performed on a scheduled *outpatient* basis either in hospitals or in free-standing outpatient facilities (ROA.4286-87, 7535, 7741-42).

16

Defendant Dr. Ricardo Cigarroa, one of the physicians in the Cigarroa Institute, is an interventional cardiologist with "privileges" to perform inpatient and outpatient procedures at both DHL and LMC (ROA.219 [¶ 36]). He also performs outpatient procedures at the Cigarroa Institute's facility (ROA.3138, 4436, 4913, 7532 [¶ 17]).

Plaintiff Laredo Physician Group ("LPG"), a DHL affiliate, employs physicians to provide inpatient and outpatient services exclusively at DHL (ROA.219 [¶¶ 22, 37]). DHL and LPG address themselves collectively as DHL, Appellants' Br. 5 n.1, and Defendants will do the same.

## B.   The market changed when Cigarroa started his own outpatient facility to better serve patients.

Before 2019, LMC and DHL ran Laredo's only cardiac catheterization labs—facilities used for catheter-based interventional cardiology procedures (ROA.3138, 7580-81 [¶ 118]). Cigarroa performed interventions at both hospitals, whether scheduled or emergency (ROA.2733-34), but from 2014 to 2019, he saw most of his patients at DHL (ROA.2712-14). DHL was also the only hospital providing heart surgery in Laredo because its affiliate, LPG, had an exclusive contract with Dr. Arthur Santos, the only cardiothoracic surgeon living in Laredo (ROA.2870-71).

After 5 years with DHL as his primary practice home for interventional procedures, Dr. Cigarroa was concerned about DHL's failure to upgrade its

17

equipment or provide a dedicated recovery space for cardiology patients, so in 2019 he built a free-standing outpatient cath lab under the Cigarroa Institute banner; it began seeing patients in 2020 (ROA.2731, 2935, 3138).

Dr. Santos also had difficulties with DHL and LPG's management (ROA.2872-77, 2882-83). In 2020, Dr. Santos signed a new agreement with LPG and asked DHL/LPG management to work with him on a three-year retirement and succession plan (ROA.2844-45, 2876, 2878).

In July 2020, Dr. Cigarroa's son, Dr. Ricardo Cigarroa II, moved back to Laredo and joined the Cigarroa Institute; he is an interventional and structural cardiologist and on arrival he performed most of his interventional procedures at DHL (ROA.2788-91, 2753-54, 3139).

## C.     In 2020, DHL sought to reassert control over the market with a new hospital-controlled, itinerant-physician model.

In early 2020, Santos and Cigarroa met with Charles Stark, a vice-president with DHL's parent company, Universal Health Services (UHS). They asked Stark, who was overseeing DHL while it was between CEOs, to update DHL's heart-care facilities and improve its program, but Stark told the doctors to wait until a new CEO could consider "where the cardiologists are taking their practice" in Laredo, including the "important development" of Cigarroa's new "outpatient Cath lab," which DHL considered a competitor (ROA.2715-16, 2879-80, 2947-48, 7412-13). When Cigarroa expressed hope

that DHL would continue investing in cardiology and would someday support development of an advanced structural heart care program (ROA.2950-51), Stark told Cigarroa that he wanted to first meet about "the potential to work with you in the [new] Cath lab" because he considered "[w]orking collaboratively in the outpatient setting" rather than competing with DHL to be "essential" to DHL's support for structural care (ROA.2956).

In August 2020, DHL hired its new CEO, Emma Montes-Ewing (ROA.222 [¶ 47]). She decided that Laredo's independent interventional cardiologists—including Cigarroa and his son—were not sufficiently loyal to DHL; she and Stark privately decided to establish a new DHL cardiology program around corporate-employed, itinerant physicians (ROA.2950-51, 7537 [¶ 28]). In an internal email, she said she took the CEO job "knowing" that her plan to "pivot" away from independent doctors would "not be well received" (ROA.2947).

Cigarroa, unaware of this plan to pivot away from independents, contacted her shortly after her arrival in September 2020 and encouraged her to recruit more general cardiologists to Laredo to build referrals for the interventionalists (ROA.2969, 3139). Though he had initially resisted DHL's overtures to convert his cath lab into a joint venture with DHL, Cigarroa said he would consider it; but he repeated his requests that DHL invest in new

facilities and recruit a cardiovascular surgeon to work with and succeed Santos (ROA.2965, 3139).

Privately, Montes-Ewing told Stark that she wanted to "play nice with the Cigarroas" while she focused on building a DHL cardiology "program without the Cigarroas" (ROA.2964, 7537 [¶ 28]). Montes-Ewing considered several interventional cardiologists (ROA.2708-09), but unlike LMC, which recruited independent cardiologists to Laredo (ROA.3139-40), Montes-Ewing and Stark agreed they would recruit only for corporate-employed doctors working exclusively at DHL (ROA.2968-69).

Montes-Ewing also arranged to bring in the Morales Group, a group of heart surgeons under contract with another UHS-owned facility in McAllen (ROA.2726). Santos was disappointed that DHL declined his invitation to jointly recruit a successor he could help integrate into the Laredo community (ROA.2889-91). Even more concerning to Santos was the Morales Group's "itinerant surgery" model, the controversial practice of rotating among cities to perform surgeries and handing off post-operative care to others unfamiliar with the patients' cases (ROA.2833-36, 2842-44).

Santos confided to Cigarroa his concerns over whether it was wise to remain at DHL (ROA.2831-32, 2842-44, 2861-62, 2884-88). What Santos did not know was that DHL was already planning for the Morales Group to

20

quickly replace Santos rather than work alongside him (ROA.2881, 2889-91, 2893, 7418-26). *See* R.E. Tab 6.

**D.    While DHL alienated independent doctors, LMC welcomed them with investments in facilities and staff.**

In February and March 2021, Cigarroa began discussions with LMC about expanding its cardiology capabilities with upgraded cath labs, equipment, and personnel, in return for which the Cigarroa Institute would support LMC with exclusive call coverage and more inpatient procedures (ROA.7428). In response, LMC's CEO Jorge Leal texted Cigarroa, "Saw your email. I'm in" (ROA.4737).

LMC, recognizing that state-of-the-art facilities would be attractive to interventional cardiologists, bought new equipment and began recruiting nurses and other staff (ROA.7459, 7574, 7577 [¶¶ 102, 110]; ROA. 2792-94, 2798-99, 3127 [¶ 5]). LMC also supported Cigarroa's long-term goal of developing a structural heart-care program (ROA.7475-76).

In March 2021, Dr. Cigarroa recommended that LMC recruit Santos, whose desire for a backup/protégé surgeon had been ignored by DHL for more than a year (ROA.2972-73, 7428). That summer, Cigarroa and LMC discussed how hiring nurses and staff to support Santos would help create a high-quality cardiology program at LMC (ROA.2761-62, 7479).

**E.    Dr. Cigarroa and Dr. Santos, unwanted by DHL, announced their moves to LMC.**

With LMC committed to growing its cardiology practice, Dr. Cigarroa and his son notified DHL in August 2021 that they would no longer provide call coverage there—although Cigarroa stated he would continue providing consultations there (ROA.2979, 3140 [¶ 10]). DHL was indifferent to their departure. Stark reported internally at DHL that the departure notice was "not unexpected," and Stark's boss replied that the Cigarroas were "[d]oing us a favor" and "removing cost" by terminating call coverage DHL did not need (ROA.2983). *See* R.E. Tab 7. Among other cardiologists, Dr. Cigarroa's brother, interventional cardiologist Dr. Carlos Cigarroa, continued to handle call coverage and perform procedures at DHL (ROA.2700, 2963-64, 7579, 7640). *See* R.E. Tab 9.

In September 2021, Dr. Santos terminated his employment with DHL effective December 2021 (ROA.2840-41). In internal communications, DHL said that Santos's departure was anticipated and would create no problems because DHL regarded him as "a huge expense and a physician that isn't very productive"; moreover, DHL had secretly expected to usher him out by November 2021, as it did not want him to "overlap too long" with the Morales Group surgeons, who were set to begin seeing DHL patients in October (ROA.2985, 2987, 7498). *See* R.E. Tab 5.

Despite DHL's indifference to Santos's departure and Dr. Cigarroa's terminating call coverage, DHL filed this suit. Internal documents produced in discovery revealed two motivations. First, in discussing Santos's departure and his non-compete restriction, DHL executives agreed that it "might be beneficial strategically to not allow him to just go over" to DHL's chief competitor, LMC, and it "shouldn't be easy" for him to do so (ROA.2985). R.E. Tab 5. Second, shortly after the Morales Group surgeons began doing surgeries, a patient deteriorated after the surgery and died (ROA.2892). DHL feared that Cigarroa would "bring this mortality to the news and make the Community aware" of it (ROA.2991). DHL struck first: it filed this lawsuit and initiated arbitration against Santos to block him from performing surgery at LMC or anywhere in Laredo for a year (ROA.10, 2848).

Santos honored DHL's non-compete demand, despite its adverse effect on heart care in Laredo and on the specialized nurses and staff who followed him to LMC but were now stuck doing services other than cardiovascular surgery. DHL says these employees were "poached" but they were anything but: they had worked with Santos at LMC until 2014; followed him to DHL from 2014 until 2021; and returned with him to LMC in 2022 (ROA.2894-2900). None were hired to "deprive" DHL, which had plenty of remaining staff, of resources needed to support surgery (ROA.3738, 3756, 3774, 3789).

23

In time, DHL's decision to align itself with the Morales Group proved unwise. DHL's own doctors regarded the group's coverage as not "reliable," and Santos observed that the group's surgeons experienced an elevated number of infections and deaths and an "operative mortality . . . unacceptable in this day and age" (ROA.2863-67, 2994-95).

DHL eventually fired the Morales Group (ROA.2850-51).

## F.    DHL could still recruit interventional cardiologists.

DHL's theory is that the defendants conspired to exclude DHL from the practice of interventional cardiology in Laredo by accommodating Dr. Cigarroa's move to LMC and hindering DHL's recruitment of cardiologists. Appellants' Brief 9-15.

DHL produced no summary judgment evidence of any "blockade" against cardiologists. DHL alleged Dr. Cigarroa engaged in "blacklisting," but Montes-Ewing admitted she was unaware of any blacklisting of prospective DHL cardiologists (ROA.2707). DHL also blamed Dr. Cigarroa for its failure to hire a cardiologist named Michael Blanc (ROA.225 [60]), but discovery revealed that Blanc and DHL disagreed about his asking price (ROA.7512). There is no evidence Cigarroa ever met or spoke with Blanc, and Montes-Ewing admitted she never asked Blanc if Cigarroa did anything to make him

feel unwelcome in Laredo (ROA.2723-24). As for LMC, no evidence exists that LMC did anything to affect DHL's recruiting or even knew of Blanc.

Moreover, during the time period of the alleged conspiracy, DHL hired interventional cardiologist Dr. Mehmet Cilingiroglu and later hired Dr. Yunus Moosa (ROA.7390-92, 7394-7410, 7563 [¶ 79]). Cilingiroglu later resigned in 2024 (ROA.5223), having "had a bad experience" at DHL and stated, "that's why I'm no longer there," concluding that DHL cannot succeed "because of bad administration, incompetent administrations and bullying the physicians like myself" (ROA.3326, 3336-37).

## G.   No evidence of conspiracy or competitive harm could be found in DHL's speculative allegations about Feldman.

What remained of DHL's "recruiting blockade" theory was a claim that the defendants conspired with the University of Texas Health Science Center -San Antonio (UTHSCSA) and the Bexar County Hospital District to block a single doctor, Marc Feldman, from working part-time at DHL, purportedly through an elaborate chain of threats. Appellants' Brief 9-13, 27, 30. This hypothesized conspiracy was immaterial due to two undisputed facts.

First, Feldman's decision not to work part-time in Laredo did not affect DHL's ability to provide interventional cardiology services and, thus, had no impact on the relevant market. Two other interventional cardiologists stayed on DHL's full-time staff and were immediately joined by Dr. Cilingiroglu;

and almost a year later DHL supplemented its clinic coverage with temporary (locum tenens) doctors.

Second, no evidence exists that the *defendants* conspired to threaten or exclude Dr. Feldman—which was the conspiracy DHL pleaded. Though DHL refers in its brief to "the Cigarroa-LMC scheme," Appellant's Brief 33, DHL offered no evidence that LMC ever took any action or even knew about Feldman's potential work in Laredo. There was no evidence LMC knew who Feldman was, knew of DHL's interest in him, discussed Feldman with Cigarroa, or ever did anything concerning Feldman (ROA.2825-26, 2911, 2922, 4843, 7369-70).

The district court concluded the Feldman episode did not raise a fact question as to DHL's antitrust claims. Still, DHL discusses Feldman at length in its brief while omitting key facts.

First, DHL discusses Cigarroa's phone call to UTHSCSA cardiologist Allen Anderson, in which Cigarroa inquired about Feldman's qualifications to perform structural procedures (ROA.2763, 2777-78). This phone call occurred the day after a DHL staff meeting at which Cigarroa voiced concerns about Feldman's plans to perform structural procedures at DHL without satisfying the requirements of federal regulations or pertinent accrediting organizations (ROA.2763, 2765-67, 2776).

No dispute exists that Feldman was neither trained in nor qualified to perform structural procedures, which he said are "challenging to learn" and "one of the most advanced techniques" cardiologists use (ROA.2812-13). Moreover, even though Feldman and Cilingiroglu told medical vendors they intended to start a DHL structural program in just two months (ROA.3011), that goal would have been impossible. In the very same email chain in which Cilingiroglu touted this goal to vendors, Montes-Ewing called the notion of DHL "opening a structural heart program . . . misinformation" and affirmed that a structural program could not happen that year (ROA.7516). DHL's panicked response to Feldman's fantastical plans validates the concerns Dr. Cigarroa expressed at the DHL medical staff meeting.

Second, Feldman categorically denied the conspiracy story that DHL pleaded. DHL pleaded that Cigarroa had threatened to pull referrals from UTHSCSA if DHL hired Feldman, that UTHSCSA then pulled Feldman's lab funding, and then had restored that funding when Feldman surrendered (ROA.231-34). But Feldman denied all of that. R.E. Tab 8. Feldman testified that Anderson never pulled his research funding; never threatened to pull that funding (which Anderson did not control); never mentioned Cigarroa; and never mentioned referrals (ROA.2814-15). Feldman made the more limited claim—which Anderson denied—that he was told he would lose his

27

San Antonio lab room if he accepted the Laredo job (ROA.2816, 7349). But even as to that narrow claim, Feldman admitted that any involvement by Cigarroa was merely "hypothesis" and speculation (ROA.2816, 2819-22).[1] In short, the target of DHL's alleged conspiracy admitted he had no evidence to support it—and, therefore, neither did DHL.

Defendants disagree with the district court about whether Feldman's speculation raised a *genuine* fact issue, but the question is moot, because, as the district court held, a supposed threat to a single one-week-per-month doctor provided no evidence to support an antitrust claim relating to the market for interventional cardiology services in Laredo.

## H.    The interventional cardiology market in Laredo has ample competition.

The Cigarroa Institute's preference for LMC had pro-competitive benefits for both physicians and patients. Since the time Cigarroa moved to LMC, Laredo now has more doctors, more medical facilities, and more interventional cardiology procedures being performed; there are more interventional cardiologists and more cath labs serving Laredo patients; and

---

[1] Though Feldman claimed this "hypothesis" was born of a discussion with UTHSCSA's president, the late Dr. William Henrich, Feldman agreed that Henrich had said he was unaware of any threat (ROA.2819-22). Henrich testified he never heard of any threat by Cigarroa or of discussions between Anderson and Cigarroa about referrals; was not himself contacted or threatened by Cigarroa; and had heard nothing about any threat to Feldman over Laredo (ROA.2919-20, 7381-83).

the volume of interventional cardiology procedures has increased (ROA.7530 [¶ 13]).

DHL offered no controverting evidence on output or price. DHL's own data confirmed that the market for interventional cardiology procedures in Laredo is *less* concentrated and thus *more* competitive than before, with three facilities offering interventional cardiology services in a market that previously had only two (ROA.7552-54 [¶¶ 63-65 and Table 1]; ROA.7674 [see ¶ 89 and Figure 8]). On the physician side, there are now at least seven interventional cardiologists in the Laredo market (ROA.7581, 7555 [¶ 67]). Patients are also benefiting from an increase in the proportion of patients receiving lower-cost outpatient procedures instead of expensive inpatient care (ROA.7574, 7580-81 [¶¶ 102, 117-20]).

DHL can also access a broad national pool of talent as needed to provide interventional cardiology services. During the time of the alleged "blockade," DHL hired interventional cardiologist Dr. Cilingiroglu from San Diego and hired Dr. Moosa from Frisco, Texas (ROA.2725, 7390-92, 7394-7410, 7563 [¶ 79]). DHL has continued working with at least three other interventional cardiologists plus a general cardiologist (ROA.2700-01). DHL recruits from a market for interventional cardiologists national in scope (ROA.2587-99, 2702-04, 2710, 2717-18, 2725, 2795-97, 3015-52, 3054-88,

3109, 3115, 3117-18, 3122-23, 3127 [¶ 6], ROA.7390-92, 7549-50), including recruiting in Texas, Arizona, New York, California, and elsewhere (ROA.2702-05, 2710-11).

DHL also contracted with multiple cardiologists on a locum tenens basis (ROA.7640 [¶ 3]). While DHL paints its employment of locum tenens physicians as an undesired byproduct of the defendants' conduct, DHL has historically had high locum tenens use across all medical specialties, not just cardiology (ROA.7586 [¶ 130]). And DHL's experts identified no evidence that locum utilization was harming the market or patients (ROA.7748 [¶¶ 61-64]; ROA.7696 [¶ 147]).

DHL stakes its competition claim on the argument that Laredo has fewer cardiologists than other mid-sized U.S. cities, but DHL's own data showed that Laredo is better-staffed in interventional cardiology than nearly any other specialty. DHL's expert analyzed 37 mid-sized U.S. cities and found that Laredo was not "underserved" in cardiology; rather, it was underserved *in general.* Laredo ranked in the bottom 3 cities for physicians-per-100,000-residents in most medical specialties—including family medicine, obstetrics, urology, anesthesiology, and surgery—and it ranked in the bottom quarter of cities in 20 out of the 23 medical specialties analyzed (ROA.7582-83 [¶¶ 121-22 and Table 5]). The only practices in which Laredo made it out of the

bottom quarter of cities were nephrology, interventional cardiology, and emergency medicine (ROA.7583 [Table 5]).

DHL itself proved that interventional cardiology is a relative *bright spot* in an otherwise challenging Laredo health care environment. The district court correctly found that comparing the raw ratio of cardiologists in Laredo to the ratio in places like Santa Cruz, California; Olympia, Washington; and New London, Connecticut, did not raise a genuine fact issue regarding harm to competition (ROA.7680).

## III.　PROCEDURAL HISTORY AND RULINGS PRESENTED FOR REVIEW.

DHL and LPG filed this lawsuit against LMC, the Cigarroa defendants, and Laredo Physician Associates ("LPA"), asserting claims for violation of Sherman Act sections 1 and 2 as well as state law claims for interference with contract and prospective contracts (ROA.52-84, 212-72). In response to a motion to dismiss, the district court dismissed the claim for interference with contract, the one claim against LPA (ROA.254-55, 937).

The Cigarroa defendants filed a counterclaim for attempted monopoly in violation of section 2 of the Sherman Act (ROA.1979-99). Based on the plaintiffs' Rule 12(b) motion to dismiss for failure to state a claim, the court dismissed the counterclaim (ROA.3291-3307). *The Cigarroa defendants appeal that ruling* (ROA.6924-26).

31

LMC and the Cigarroa defendants filed a summary judgment motion seeking dismissal of plaintiffs' remaining claims (ROA.2638-3142, 3312-60). The district court, the Honorable Judge Xavier Rodriguez, granted that motion and ruled that plaintiffs take nothing on their remaining claims and signed a judgment dismissing those claims (ROA.6781-6847, 6848). *The plaintiffs appeal that ruling* (ROA.6875-76).

## Summary of Argument

The summary judgment record shows that there is no genuine issue of material fact regarding the plaintiffs' claims. The plaintiffs cannot prove antitrust liability or antitrust injury.

First, the market for interventional cardiology services in Laredo was not harmed by the alleged conduct. DHL continues to operate in interventional cardiology and did not demonstrate that it was likely to shut down. DHL's expert did not opine as to any price or output impacts in the market for interventional cardiology services, whether relative to the past or relative to a but-for world. On the contrary, the alignment of Dr. Cigarroa with LMC expanded facility capacity and created *more* competition in interventional cardiology.

Second, DHL did not raise a fact issue on its Sherman Act section 1 claim because DHL did not demonstrate per se liability or competitive harm under the rule of reason. Characterizing Cigarroa's exclusive call-service agreement with LMC as a "group boycott" of DHL does not give rise to per se liability. Per se liability only applies to naked conspiracies that cut off access to essential facilities and have no plausible procompetitive benefits. Here, Cigarroa physicians were not at all essential to running DHL's emergency room. The LMC-Cigarroa relationship had plausible procompetitive benefits

33

because the arrangement resulted in expanded output and because (as DHL admits) exclusive call-service arrangements *enhance* hospital service. It is undisputed that, absent per se liability, a Section 1 claim requires a showing of anticompetitive effect, which was not shown here.

Third, DHL did not raise a fact issue on its Sherman Act section 2 claim for attempted monopolization. Attempted monopolization requires proof of a dangerous probability of achieving monopoly power as well as proof of exclusionary conduct. DHL did not demonstrate that LMC and Cigarroa attained the power to control price or exclude DHL from the market, or that a dangerous probability existed they would do so. DHL did not demonstrate exclusionary conduct either, as DHL's access to other cardiologists meant it was not excluded (or even likely to be excluded) from the market, whether based upon Cigarroa's decision to deal exclusively with LMC or by Feldman's decision not to work in Laredo.

Fourth, DHL did not demonstrate that it has suffered antitrust injury. It was not excluded from the market for interventional cardiology services by any of the alleged conduct; DHL did not demonstrate that the market for interventional cardiology services was less competitive; and DHL necessarily did not demonstrate that it had suffered any injury flowing from a reduction in competition in the interventional cardiology market. The contention that

Dr. Feldman suffered exclusion from the interventional cardiology market did not demonstrate that DHL was excluded from the market, as DHL's expert found Feldman's absence resulted in no loss of procedures by DHL.

Last, the district court correctly dismissed Dr. Cigarroa's counterclaim. That claim, that Cigarroa suffered injury when DHL excluded Santos from the market, was a legal mirror image to DHL's claim that DHL suffered injury from Feldman's exclusion from the market. But if this Court were to rule that the purported exclusion of Feldman resulted in antitrust injury to DHL, the same rationale would warrant reinstatement of Cigarroa's counterclaim.

## Argument – Plaintiffs' Appeal

### I.    THE SUMMARY JUDGMENT STANDARD OF REVIEW IS DE NOVO.

DHL challenges a summary judgment. Appellants' Brief 2. This Court reviews a summary judgment de novo. *See FTC v. ZAAPPAAZ, LLC*, 140 F.4th 675, 680 (5th Cir. 2025). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Defendants can meet their summary judgment burden "by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012).

### II.    THE SUMMARY JUDGMENT PROOF DEMONSTRATES DHL CANNOT PROVE COMPETITIVE HARM OR ANTITRUST INJURY.

DHL argues that the defendants' vigorous competition to hire staff and Dr. Cigarroa's objections to Dr. Feldman's qualifications were based upon anticompetitive animus. They were not, but that fact question is moot. From a market perspective, the friction between DHL and the defendants occurred backstage. And that backstage friction did not affect what happened on the

stage itself, i.e., in the market for interventional cardiology services in Laredo. Patients in Laredo had access to *more* physician and facility options and suffered no adverse price, quality, or wait time impacts. The market was as competitive as ever.

DHL's inability to prove competitive harm is the death knell for its antitrust claims. As DHL concedes, absent a viable per se claim, DHL must establish anticompetitive effects to bring a Section 1 claim. Appellants' Brief 50. Section 2 requires slightly different proof—a "dangerous probability" of achieving monopoly power—but DHL's inability to show competitive harm also dooms its Section 2 claim.

## A.    Defendants' conduct did not impact prices: there were more doctors performing more procedures at more facilities.

After years of discovery, DHL failed to produce summary judgment evidence of competitive harm—no evidence that its own capacity to perform cardiology interventions had been diminished, and no evidence that the market for interventional cardiology services had been affected.

DHL never withdrew from the interventional cardiology business or any part of it, and DHL offered no evidence that it even considered doing so. Indeed, during the supposed conspiracy, DHL hired two new cardiologists on a permanent basis (ROA.7390-92, 7394-7410) and several more on a locum tenens basis (ROA.2700, 7640). Indeed, DHL was so well staffed in

cardiology that when one of their new cardiologist hires, Dr. Cilingiroglu, offered to ramp up his emergency call coverage from one week per month to two weeks, DHL declined his offer (ROA.3352).

Moreover, the challenged conduct created new capacity to serve local patients. Because the Cigarroa Institute opened a new outpatient clinic and LMC built new inpatient catheter labs, there were more facilities performing interventional cardiology procedures and less market concentration than before (ROA.7552-54 [¶¶ 63-65 and Table 1] (citing to Pflum Report ¶ 89 and Figure 8 at ROA.7674)).

With new capacity coming online, the market for services grew rapidly. Interventional cardiology procedures performed in Laredo grew each year from 2020 to 2022, for a 34% increase over the period (ROA.7555-57 [¶¶ 67-68 and Tables 2 and 3]).

There was no evidence of price impacts during the period either. Even though DHL's expert Dr. Pflum used economic tests that he opined could predict price effects based on market concentration (ROA.7670 [¶ 82]), he did not opine that concentration had driven prices up or output or quality down (ROA.7543-44 [¶ 44]).

As a result, in its summary judgment response, DHL conceded there was no evidence of a price increase or output reduction in the interventional

cardiology market in Laredo (ROA.4255). The district court agreed, ruling that the record showed no price impacts for patients or insurers (ROA.6841). Likewise, the court found no evidence for DHL's backup position—that the market missed the chance to reduce prices or increase output. DHL's expert, Dr. Pflum, had not rendered any opinion that there would have been price reductions or output increases in a but-for world (ROA.6839-40).

DHL nevertheless contends that it has demonstrated anticompetitive impact. DHL did not do so.

## B.   DHL did not prove anticompetitive effects.

After carefully examining the record and DHL's lengthy expert reports, the district court correctly observed that Dr. Pflum could not opine that the market was less competitive (ROA.6839-42). DHL now plucks statistics and tidbits out of Dr. Pflum's reports—often statistics on which even Dr. Pflum did not believe he could base a competitive-effect conclusion—in hopes that this Court will infer more than DHL's own economist did.

### 1. *Market share figures alone do not prove anticompetitive effects.*

DHL represents that it offered "market structure evidence" of anticompetitive effects—by which DHL means that collectively LMC and the Cigarroa Institute host more than 70% of cardiology interventions in Laredo. Appellants' Brief 50. However, market share figures, standing alone, do not

demonstrate market power or give rise to a claim. "[T]he law does not make mere size an offense, or the existence of unexerted power an offense." *United States v. U.S. Steel Corp.*, 251 U.S. 417, 451 (1920). Indeed, a high-market-share seller may be powerless to raise price above the competitive level, depending on market characteristics. "Even a 100% monopolist may not exploit its monopoly power in a market without entry barriers." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997).

In the present case, it was undisputed DHL brought new cardiologists into the Laredo market on both a permanent and temporary basis and has continued competing for interventions (ROA.4506,4530-32, 4554).

DHL's authorities do not support the argument that anticompetitive effect may be presumed based on market share or market concentration alone, especially when no evidence exists that concentration is affecting (or even can affect) price or output in a given market. DHL cites *Domed Stadium Hotel Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Cir. 1984), for the proposition that market concentration "supports" a finding of market power, but in that case this Court eschewed setting "a market share percentage that of itself rises to the level of legal significance" and directed courts to consider market-specific factors in assessing what share was indicative of market power. *Id.* at 490-92.

Likewise, in *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964 (5th Cir. 1977), this Court pointed to high market share as relevant to its monopoly power discussion but did so only in conjunction with "substantial evidence" that the defendant's tying arrangements had "narrow[ed] access and prohibit[ed] production" by its competitors. *See id.* at 981. DHL—which continued operating during the time at issue in a growing market—offered no such evidence. Even though Dr. Pflum opined that economic studies can be used to measure facilities' "gain [of] significant market power to raise their prices" based on the amount of competition in a market (ROA.7672 [¶ 87]), Dr. Pflum offered no opinion that defendants had gained the power to raise prices, and he did not predict any increase in (or stabilization of) prices.

Moreover, in both *Domed Stadium* and *Heatransfer*, the court considered whether a *single* defendant's market share was sufficient to indicate that that defendant had market power. Neither case considered combining market shares for different competitors to assess whether either (or both) had attained market power.[2] In this case, DHL concedes that LMC and the Cigarroa Institute compete with one another (Appellant's Br. at 38)

---

[2] DHL asserts that this Court considered combined market shares in *United States v. American Airlines, Inc.*, 743 F.2d 1114 (5th Cir. 1984), but in that case, the court considered whether two companies with 90% market share could affect price by agreeing to fix prices. The question was not whether some market share figure demonstrates that an alleged monopolist must have market power, or whether such a figure can be reached by adding competitors together when they are continuing to compete with one another.

41

for the only procedures they both offer—outpatient procedures—and DHL submitted no summary judgment proof that price or volume competition for those procedures had lessened.   The market remained active and competitive.

### 2. There was no evidence that a structural care program in Laredo was actually possible or, if possible, actually delayed.

DHL makes two claims about potential impacts on cardiology care. First, DHL claims that a hoped-for structural heart care program has been delayed. Appellants' Brief 54. DHL's selective recitation of the record does not address the shortcoming the district court identified in this theory: "the record does not contain evidence that any pipeline or program could have been established" (ROA.6842). In short, DHL offered no evidence that it would ever have been capable of starting a structural program or that the defendants did anything to prevent DHL from starting one.

Below, DHL admitted that starting a structural program was a multi-step process that required years of preparation—including hiring a structural cardiologist, seeking facility accreditation, building a specialized operating room, purchasing new equipment, and meeting an annual minimum volume of interventional procedures well above any volume DHL had ever performed, even during the time DHL had been market leader (ROA.4216, 4998 [¶ 15]). DHL accomplished only one of these many tasks: they hired Dr.

Cilingiroglu, a structural interventionalist (ROA.7390-92). The doctor that DHL says the defendants excluded—Dr. Feldman—had no training in structural work and thus could hardly have been critical to a structural program (ROA.2812-13). Evidence that DHL dreamed of a structural program, or that such a program would be desirable, does not demonstrate that DHL suffered harm. As the district court concluded: "Speculation does not create fact issues, and 'speculation about anticompetitive effects is not enough' to show market injury" (ROA.6842).

Second, DHL argues that there is a "delay in response" to heart attacks in Laredo because of a physician shortage and then suggests that the purported exclusion of Dr. Feldman perpetuated this "shortage" of physicians. Appellants' Brief 53. Again, DHL ignores the critical undisputed fact: there was no evidence that adding one more cardiologist in Laredo would result in improved emergency response or in DHL seeing more patients or performing more procedures. DHL's economist, Dr. Pflum, projected no increase in patient or procedure counts in his damages model. On the contrary, his damages model presumed that all the work Dr. Feldman would have done at DHL was ultimately still performed there—it was just performed by DHL's locum tenens physicians or Dr. Moosa instead of by Dr. Feldman (ROA.8645). And DHL's behavior reflected their belief that they

were not constrained by any staff shortage; DHL declined more staffing when it was offered, refusing Dr. Cilingiroglu's offer to work more (ROA.3352).[3]

### 3. Even DHL's expert did not claim the post-pandemic procedure counts demonstrated competitive harm.

DHL argues that in one pre-pandemic year, 2019, Laredo's interventional procedure volume was higher than in subsequent years—and DHL contends that this fact alone should raise a fact question, because summary judgment would not be appropriate if a "factfinder could conclude that Defendants' conduct had decreased output." Appellants' Brief 55. But DHL's own expert, Dr. Pflum, opined that no such conclusion was possible.

With respect to the procedure counts DHL recites in its brief, Dr. Pflum opined those data were not sufficient to reach any conclusion, writing "it is not possible to reliably assess how the [Defendants'] conduct affected overall interventional cardiology output" (ROA.9987 [¶ 78]). The district court correctly noted that Dr. Pflum offered no conclusion that the defendants had slowed the growth of these procedure volumes (ROA.6839). As Pflum explained, the 2020 COVID pandemic, which inundated hospitals and often forced deferral of elective procedures, led to a drop in both the number of

---

[3] DHL even implies that before the events of this case, one of its patients died due to a shortage of cardiologists. Appellants' Brief 53. That is false. Rather, the DHL emergency room failed to timely identify a patient as having a treatable heart attack, preventing timely delivery of care (ROA.4560)—but that tragic event has nothing to do with this case, for the reasons described above.

interventional cardiology patients seen and the number of interventional procedures performed in Laredo (ROA.9985-87). But since 2020, interventional cardiology procedures grew rapidly, and the number of cardiology patients grew as well. In 2021, the number of interventional cardiology *patients* treated in Laredo not only beat the 2020 pandemic year by 28.7%—it also beat the pre-pandemic 2019 year by 18.1% (ROA.9987). So regardless of the number of individual procedures billed during patient treatment (the figure DHL touts in its brief), it was undisputed *more patients received interventional cardiology care in Laredo, no matter what baseline year was used.*

### 4. DHL's use of locum tenens physicians did not demonstrate competitive harm or antitrust injury.

The district court correctly ruled DHL's use of locum tenens doctors did not demonstrate competitive effects or give rise to antitrust injury. First, DHL's use of locum tenens doctors to cover interventional cardiology was infrequent—averaging a little more than one day a month, less often than it used locums to cover other specialties like obstetrics. (ROA.4947-58, 4961-66). Second, DHL's infrequent use of locum tenens doctors had no effect on interventional cardiology prices or patients' access to cardiologists (ROA.6841). Third, the district court correctly ruled that Dr. Pflum's notions about "continuity-of-care" impacts from using temporary cardiologists were

45

hypothetical at best (ROA.6841-42). DHL could not prove that any patient received substandard care from locum doctors, either in absolute terms or relative to a but-for world (ROA.4292-93, 7648 [¶ 27]; ROA 7689 [¶ 105]). Indeed, the notion that locum physicians were worse for "continuity" of care than Dr. Feldman would be—when he only intended to work in Laredo one week per month anyway—was never shown (ROA.7696 [¶¶ 147-48]). No one testified that DHL's use of locums affected DHL's standing with patients or reduced its revenue in the interventional cardiology marketplace.

### 5. The "raising rival's costs" theory does not demonstrate competitive harm.

DHL's last argument on competitive effect is that if DHL relied on locum tenens doctors, that would demonstrate use of a "raising rival's cost" strategy because locum doctors are often more expensive on a per-hour basis than permanent employees. DHL argues this Court has endorsed "raising rivals' cost" as antitrust injury, when in fact the opposite is true. In *BRFHH Shreveport LLC v. Willis-Knighton Medical Center*, 49 F.4th 520 (5th Cir. 2022), this Court stated that "we are skeptical of raised costs as a standalone theory" of antitrust injury and described it only as "a form of antitrust injury in cases where the defendant has *already* violated antitrust law in some other way." *Id.* at 529 n.4. This Court then quoted the Areeda & Hovenkamp treatise, which describes raising rivals' costs as a "sometimes useful but also

46

incomplete definition of exclusionary practices." *Id.* (citing P. AREEDA & H. HOVENKAMP, ANTITRUST LAW: ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION § 651 (2022)). In other words, this Court remarked that if a plaintiff proved it had been ultimately excluded from competition by conduct giving rise to Section 2 liability, that plaintiff could likely argue that its "raised costs" made up part of its injury. But this Court stated it was "skeptical" of the approach DHL takes here: arguing that raised costs by themselves are an antitrust injury, even though there is no evidence that those costs excluded DHL from the interventional cardiology market or posed a dangerous probability of defendants achieving market power.

This makes sense, as Areeda and Hovenkamp explain, because much conduct beneficial to competition raises rivals' costs. PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION (CCH) § 651b5 (May 2025) ["ANTITRUST LAW"]. For example, introducing innovative products forces rivals to invest in product development, and competing for labor drives up wages for all; those effects "raise costs" but represent beneficial competition at work.

DHL proved no harm to competition or consumer welfare. Whatever complaint DHL had was not an antitrust claim.

**III.   DHL RAISED NO FACT QUESTION ON ITS SHERMAN ACT § 1 CLAIM.**

DHL asks this Court to treat the Cigarroa-LMC alignment as per se illegal so that DHL's Section 1 claim can be revived, despite the lack of any evidence that the alignment harmed competition. Appellants' Brief 39-50. But DHL itself recognizes that these defendants' alignment does not fit the naked-horizontal-conspiracy framework of the per se rule. Dismissal of the Section 1 claim was therefore correct.

**A.   The Cigarroa-LMC alignment is a mixed vertical and horizontal relationship with procompetitive benefits.**

Before turning to prevailing law, we recap the undisputed facts that determine which antitrust doctrines apply. As the district court recognized, the defendants' relationship is both horizontal and vertical:

- Dr. Cigarroa provides on-call physician services to LMC so that LMC can treat patients having heart attacks or other emergent conditions; to that extent, their relationship is purely vertical.

- If a patient is admitted to the hospital, then the vertical relationship takes on an additional complementary aspect: Dr. Cigarroa provides *physician* services to the inpatients, while LMC provides parallel *facility* services to the inpatients. The relationship retains its vertical aspect, in that Dr. Cigarroa must use the LMC facilities to provide his physician services and LMC must rely on medical staff doctors with

48

hospital privileges to provide its facilities services. No part of this inpatient treatment relationship is horizontal, however: Dr. Cigarroa cannot provide *facility* services at LMC, and LMC cannot provide *physician* services.

- Cigarroa and LMC are horizontal competitors in only one respect: they both provide *outpatient* interventional cardiology services in their own facilities (Cigarroa at his clinic, LMC at the hospital).

(ROA.6830). It is undisputed that the Cigarroa-LMC relationship is vertical, as DHL expressly acknowledges. Appellants' Brief 39, 41.[4]

## B.    The Cigarroa - LMC alignment did not invoke Sherman Act section 1 per se liability.

Both below and in this Court, DHL characterizes the Cigarroa-LMC alignment as a "group boycott," and argues anything DHL can characterize as a group boycott is per se illegal. The district court correctly saw through this argument. So-called group boycotts formed through beneficial vertical

---

[4] At times, DHL's brief suggests (without citing evidence) that the relationship between a hospital (e.g., LMC) and a physician-owned clinic-operating entity (e.g., the Cigarroa Institute) is purely horizontal and the relationship between the hospital and the individual physicians (e.g., Cigarroa) is purely vertical. That distinction has no basis in the record, which shows that hospitals contract with physician entities, not just individual physicians (ROA.3811, 8491-92).

For example, in Dr. Pflum's rebuttal report, he cites DHL's former on call-service supply arrangement with Cigarroa (DHL-4012), which was a contract between DHL and the Cigarroa Institute, the same defendant entity that owns the outpatient facility (ROA.9956 n.15). Indeed, DHL acknowledges that when Dr. Cigarroa practiced at DHL, he "practiced through his company," the Cigarroa Institute. Appellants' Brief 5.

relationships, rather than naked boycotts originated by purely competing firms, can only be challenged under the rule of reason.

### 1. Under DHL's own characterization of the Cigarroa-LMC alignment, per se liability cannot apply.

Section § 1 prohibits only unreasonable restraints of trade. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998). Most restraints are analyzed under the rule of reason, which considers a variety of factors concerning the nature of the restraint and its market effects. *MM Steel LP v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848 (5th Cir. 2015). But when courts have a long-standing familiarity with a certain kind of restraint and consistently find that it has "pernicious" anti-competitive effects and a "lack of any redeeming virtue," those restraints may be conclusively presumed unreasonable—or per se illegal. *Id.*; *see also FTC v. Super. Ct. Trial Lawyers' Ass'n*, 493 U.S. 411, 432-33 (1990).

Although the Supreme Court in the 1940s and 1950s held some "group boycotts" to be per se illegal—*see, e.g.*, *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959), and *Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457 (1941)—the Court recognized in the 1980s that there was much "confusion" about that label and that defining "[e]xactly what types of activity fall within the forbidden category is . . . far from certain." *Nw. Wholesale Stationers v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294

(1985). The Court held that per se liability applied only when the boycotters' arrangements (1) "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete," and (2) are "not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." *Id.* at 294. The Court held that the per se rule of presumed competitive harm would not apply to concerted action unless the boycotters possessed "market power or exclusive access to an element essential to effective competition." *Id.* at 296. Absent that showing, a court applies ordinary rule-of-reason analysis. *Id.* at 297. In *Northwest Wholesale*, that meant that an office supply retailer expelled from a wholesale purchasing cooperative could not impose per se liability for his expulsion without explaining why he had to join that cooperative (rather than just seeking other supply sources) to do business. *Id.* at 297-98.

In *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998), the Supreme Court explained that the per se rule of the older cases would rarely apply to an exclusive dealing supply arrangement. *Id.* at 135. For such arrangements, the per se rule applies only if no legitimate business reason exists for the exclusive arrangement. *Id.* Otherwise, the rule of reason applies and the plaintiff "must allege and prove harm, not just to a single competitor, but to the competitive process, i.e., to competition itself." *Id.* So *NYNEX* clarified

that the per se rule applies only to "naked" restraints among groups of competitors; it does not apply to "an agreement between a single rival of the plaintiff and a single vertically related firm," which is typically nothing more than an exclusive dealing arrangement to be judged under the rule of reason. *See* ANTITRUST LAW (CCH) ¶ 2204c.[5]

*NWS* and *NYNEX* dictate three reasons why the rule of reason, not per se treatment, must apply in this case.

First, the record makes plain that the Cigarroa-LMC arrangement is an exclusive-dealing supply arrangement, which is subject to the rule of reason. In its brief, DHL complains that the Cigarroas had effected an "exclusive shift to LMC and corresponding refusal to supply DHL with interventional heart care"; that LMC "cut off its doctors' services to DHL" and "shifted its members' practices," action that allegedly limited "DHL's supply of interventional cardiologists"; and that defendants' working exclusively at LMC constituted a "concerted refusal to deal with DHL." Appellants' Brief

---

[5] Plaintiffs argue that if LMC and the Cigarroa Institute compete *at all* (such as for outpatient procedures), any arrangement between them is horizontal and automatically qualifies for *per se* treatment. Plaintiffs misunderstand the analysis. The question is not whether there is *any* horizontality in the business arrangement; the question is whether there are plausible procompetitive justifications for the arrangement. *Fully* horizontal competitors would rarely have procompetitive reasons to cooperate, but when businesses with a partly vertical (and only partly horizontal) relationship cooperate, then there is reason to consider whether that relationship generates procompetitive benefits—and thus there is no automatic *per se* treatment, as demonstrated in *Northwest Wholesale Stationers*, a mixed horizontal/vertical case.

18, 31, 34, 40. DHL argued this below, arguing that "exclusively dealing with LMC is anticompetitive conduct," characterizing its claim as an "exclusive dealing claim," and arguing that when the Cigarroas moved their practice to LMC, that act "cut off Plaintiffs' supply of interventional cardiologists" (ROA.4241, 4253, 4254). *NYNEX* holds such exclusive supply arrangements are subject to the rule of reason.

Second, as DHL conceded below, the Cigarroa-LMC alignment gave rise to output-expanding investment. DHL argued that the Cigarroa practice shifted its inpatient practice to LMC and committed its emergency call coverage exclusively to LMC in exchange for LMC upgrading catheterization labs and resuming an open-heart surgery program so as to field a complete, competitive heart care option in Laredo (ROA.4207, 4214-15, 4222, 4232). That created a second cardiology option in Laredo for inpatient, outpatient, and surgical capability, when theretofore DHL had been the only option.

Third, it is undisputed that vertical hospital-physician relationships generate plausible efficiencies and procompetitive benefits in interventional cardiology. DHL explained its decision to sideline independent cardiologists like the Cigarroas in favor of hospital-affiliated cardiologists like Cilingiroglu on the grounds that when a doctor took call at only one hospital, that would limit the risk that a hospital would have to turn away heart attack patients or

have patients wait when an independent on-call physician was simultaneously "stacking" call coverage at multiple hospitals (ROA.4204, 4207-08, 4214). The Cigarroa-LMC alignment provides LMC with the same exclusive-supply access that DHL admits it desired (ROA.222, 224 [¶¶ 48-49, 55]).

Fourth, DHL never raised a fact question on whether it lost access to physicians essential to DHL's ability to compete in interventional cardiology. DHL could hardly claim that the Cigarroas (whom DHL sought to sideline) or Santos (whom DHL was primed to replace with a corporate-controlled surgical team) were essential. Neither was Dr. Feldman critical; DHL still had access to multiple Laredo cardiologists to cover call; DHL was able to recruit more cardiologists and did so; and DHL was able to supplement using locum tenens cardiologists. Absent proof of essentiality, per se boycott theory does not apply.

*2. DHL misreads this Court's* MM Steel *precedent.*

DHL argues that *MM Steel LP v. JSW Steel (USA) Inc.*, 806 F.3d 835 (5th Cir. 2015), dictates per se liability for conduct that one may characterize as "group boycotts to foreclose an entrant from the market." Appellants' Brief 39-40. DHL ignores the reasoning in *MM Steel*, which relied on the same

factors that *Northwest Wholesale* and *NYNEX* emphasized in determining per se treatment. *MM Steel*, 806 F.3d at 848-49.

*MM Steel* involved a naked horizontal conspiracy to withhold necessary resources. Two incumbent steel distributors agreed they would jointly boycott any steel manufacturers who sold steel to a new distributor entering the market. *Id.* at 840. The distributors communicated this position to a manufacturer, who knowingly joined the plan and cut off the new entrant distributor. *Id.* at 841. The new entrant, without a supply of steel to sell, went out of business. *Id.* at 842. In its opinion, this Court described the conduct in *MM Steel* as a "horizontal conspiracy among the competitors, the distributors." *Id.* at 844. The fact that a manufacturer later "knowingly" joined the arrangement between the competing distributors, "both of whom had already formed a horizontal conspiracy," *id.* at 845, did not change the character of the conspiracy. In such a case, "the vertical participants, the manufacturers, actually join the horizontal conspiracy." *Id.* at 849.

DHL misreads *MM Steel* to suggest that if any element of horizontal competition between two commercial actors exists then any arrangement between them is automatically horizontal and subject to per se analysis. That was not the Court's holding.

Rather, the *MM Steel* conspiracy was formed between two competitors, having no routine business dealings with each other, who formed an agreement for the sole purpose of excluding a new competitor. That naked conspiracy was purely horizontal, generated no plausible benefits, and was intended to cut off the new competitor's access to any supply of product—which it did, driving the new competitor out of business.

Here, however, the "conspiracy" at issue was a vertical supply relationship from the moment of inception. It generated benefits for both parties: LMC received better call coverage and more opportunities, and Cigarroa could perform procedures in improved facilities and a better working environment. It generated benefits for the market, too: it created a more robust cardiology competitor to DHL. And DHL was not deprived of necessary resources; the only thing DHL "lost" was a surgeon it had already decided to fire and cardiologists it said in internal emails it did not need—a belief borne out by the undisputed fact that DHL never stopped competing in interventional cardiology, even after Cigarroa left.

DHL's reading of *MM Steel*—that any conspiracy among parties with a partially horizontal relationship is per se illegal—is inconsistent with the holding in *Northwest Wholesale.* There, the participants in the group purchasing arrangement were all purely horizontal competitors, and the

plaintiff alleged they had conspired to exclude a new entrant. Yet the Supreme Court applied the rule of reason in that case, just as it would in this one, because commercial relationships with competitive benefits should not be deemed illegal without considering actual market impacts.

### 3. DHL's other arguments for per se treatment are unavailing.

DHL makes two other arguments for per se treatment, neither of which are compatible with *Northwest Wholesale* or DHL's arguments below.

First, DHL suggests that a conspiracy between Cigarroa and LMC to exclude Feldman, if separated from any vertical relationship between them, could qualify as a naked conspiracy to exclude a competitor. DHL did not pursue that "standalone-conspiracy" argument in the district court, and for good reason: DHL had no evidence that LMC even knew DHL was recruiting Feldman or that Cigarroa had raised objections to Feldman's dangerous structural plans.  So DHL carefully avoided arguing that LMC had engaged in any concerted action related to Feldman; instead, DHL argued that LMC's supply agreement with Cigarroa was enough to impute to LMC any of Cigarroa's conduct relating to Feldman.[6]

---

[6] Compare page 31 of DHL's summary judgment response to pages 28 and 30 (describing LMC as involved in Santos's recruitment and call service, but not Feldman, and suggesting that the court should treat the conspiracy as a whole without proving LMC's knowledge of each action that furthered the conspiracy) (ROA.4231, 4233, 4234).

Because DHL's only theory for imputing the Feldman events to LMC was that LMC entered into a vertical agreement with Cigarroa, DHL can hardly argue in this Court to treat the Feldman issue as a standalone horizontal conspiracy in which LMC participated; DHL tacitly acknowledged it could not raise a fact issue as to a standalone Feldman conspiracy. In addition, as the district court recognized, Feldman was not a resource that DHL needed to compete, so under *Northwest Wholesale*, a conspiracy to exclude him would not entitle DHL to bring a per se claim over his exclusion.

Second, DHL suggests a conspiracy among Dr. Cigarroa, Dr. Anderson, and Dr. Feldman to deprive DHL of access to cardiologists would trigger per se treatment under *Feminist Women's Health Center, Inc. v. Mohammad*, 586 F.2d 530 (5th Cir. 1978). DHL contends that *Mohammad* reversed a summary judgment on the application of per se liability. That is incorrect. The defendants in *Mohammad* obtained summary judgment only on *Noerr-Pennington* grounds; this Court, finding *Noerr-Pennington* did not apply to the defendants' actions, reversed and remanded. *Id.* at 546. Per se liability was discussed only because the defendants alternatively argued for affirmance under the rule of reason. This Court declined that alternative, concluding there was a fact dispute as to reasonableness and reserving for the trial court on remand whether the plaintiff could justify per se treatment

instead. *Id.* at 546-47. Nothing in *Mohammad* reaches any conclusion on whether per se liability applied or announces principles that could carve back the teachings of *Northwest Wholesale* and *NYNEX*.

## C.     Because there was no evidence of anticompetitive effect, DHL had no claim under the rule of reason.

As DHL concedes, the district court correctly held that when the rule of reason applies, a plaintiff has the burden to prove anticompetitive effects (ROA.6833). Appellants' Brief 50 (citing *Impax Laboratories, Inc. v. FTC*, 994 F.3d 484, 492 (5th Cir. 2021)). DHL's failure to offer competent evidence that competition was harmed, *see supra* Section II.B, is therefore fatal.

## IV.    DHL RAISED NO FACT QUESTION ON ITS SHERMAN ACT § 2 CLAIM OF ATTEMPTED MONOPOLIZATION.

In its complaint, DHL asserted actual monopolization and a separate claim for attempted monopolization (ROA.246-52). Perhaps recognizing that its continued market presence over several years makes a claim of actual monopolization untenable, DHL appeals only as to its Third Cause of Action, attempted monopolization (ROA.249-52).

To prove a claim for attempted monopolization, a plaintiff must prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power" in the relevant market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Market power or monopoly power is

the "power to control prices or exclude competition" in a relevant market. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).

The district court correctly found DHL raised no fact issue on the first or third elements, as the alleged conduct did not affect the market and was not anticompetitive (ROA.6843-45). DHL identifies no evidence satisfying these elements.

## A.    DHL did not demonstrate a dangerous probability the defendants could attain market power.

DHL barely mentions the "dangerous probability" element of the claim for attempted monopolization. Its sole argument to demonstrate dangerous probability is that "the Cigarroa Institute already had a high market share" in 2021 and that the defendants "believed their scheme would eliminate their only competition." *See* Appellants' Brief 24. But that does not demonstrate a probability of achieving market power over price or output.

First, as described *supra* Section II.B., market share alone does not demonstrate market power—especially in the absence of entry barriers that allow a monopolist to raise price without fear of competitive entry. Here, the district court concluded that DHL was able to continue hiring cardiologists and resources it needed and also found that DHL's expert did not conclude any entry barriers were affecting competition (ROA.6832, 6840-41).

Second, evidence that the defendants "believed" they could defeat DHL in competition does not demonstrate a probability of achieving power over price or output. At most, such a belief would satisfy the second element of attempt—specific intent to monopolize. But "intent . . . alone is not sufficient, to establish the dangerous probability of success that is the object of § 2's prohibition." *Spectrum Sports*, 506 U.S. at 455. The plaintiff must prove a "risk of success" of "monopoly power." *See Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000). Absent the risk-of-success element, Section 2 would overrun its market-focused boundaries and "reach practices only unfair, impolite, or unethical." *United States v. Am. Airlines*, 743 F.2d 1114, 1119 (5th Cir. 1984). Such practices may implicate tort or other law, but they are not the concerns of antitrust law.

DHL had no evidence that the defendants were dangerously likely to achieve monopoly power. It failed to prove the third element of the claim.

## B.   DHL did not demonstrate exclusionary conduct.

DHL argues that the district court improperly took competitive effects into account in deciding whether the defendants' conduct was exclusionary, the first element of attempted monopolization. The district court did not err in considering this evidence.

61

"Exclusionary conduct" means "conduct, other than competition on the merits . . . capable of making a significant contribution to creating or maintaining monopoly power." *See Taylor*, 216 F.3d at 475. Certain conduct constitutes competition on the merits and thus by its nature is not exclusionary; other types of conduct, although anticompetitive, may not be exclusionary simply because it is incapable of creating monopoly. Either way, this Court has explained that effects are relevant evidence. Even if conduct could theoretically be "exclusionary" without proven competitive harm, the "actual effects of a defendant's conduct might be relevant to determining its predatory nature" or "the state of the market," *see id.*, as even DHL concedes. Appellants' Brief 25. In this case, the effects evidence only confirmed that the conduct was not exclusionary.

### 1. Competitive effects are relevant.

DHL's cases only emphasize how rare it would be to find attempted monopolization without competitive harm. In *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980 (5th Cir. 1983), this Court held a plaintiff "damaged" by exclusionary conduct "from a short term perspective" could pursue an attempted monopoly claim even if the plaintiff ultimately survived and prevailed in competition. *Id.* at 991. To reach that result—that this Court acknowledged "[a]t first sight, might strain credulity"—this Court analyzed

the market structure at the time of the defendant's conduct, the likelihood that the defendant could have strangled the new-entrant plaintiff's business in the crib, and the reasons why the plaintiff was able to overcome defendant's exclusionary conduct to assess whether there had been a dangerous probability of success. *Id.* Here, DHL fails to prove either the short-term harm or the dangerous probability of long-term monopolization found in *Multiflex.* It did not do so in the district court either: in its argument below, DHL simply cross-referenced its own speculative assertions about whether the market could have grown more (ROA.4262-63). To prove exclusionary conduct, DHL relied solely on the actual market outcomes the district court had already concluded failed to prove actual or potential competitive harm.

Similarly, in *Taylor* this Court emphasized that one can deem conduct exclusionary without a showing of realized competitive harm if the plaintiff "provided evidence that [the conduct] could, potentially, harm competition by putting [the plaintiff] out of business." *Taylor*, 216 F.3d at 482. In contrast, there was never any evidence in this case that DHL was going out of business. It never began exit preparations; it chose to go forward without Feldman; and internal emails confirmed that it did not believe it needed the Cigarroas or Santos to compete.

*2. Cigarroa's alignment with LMC was not "exclusionary" conduct.*

DHL argues two types of "exclusionary" conduct. First, DHL argues it was anticompetitive for Dr. Cigarroa to "cut off" his call service to DHL and supply his service exclusively to LMC. Appellants' Brief 31-34. As the district court recognized, that is competition and not exclusion. As described above, DHL changed the competitive landscape when it chose to shift its business model from engaging independent cardiologists and a local surgeon to employing hospital-affiliated cardiologists and traveling surgeons. Aligning with LMC gave Cigarroa the chance to compete with DHL's new corporate-controlled offering and preserve the independence he believed promoted better patient care. Moreover, defendants' competing with DHL to hire staff and a surgeon was pro-competitive, especially when it did not deprive DHL of the resources it needed to continue (ROA.6832-39).

In effect, DHL claims that Cigarroa must work at DHL to help DHL compete with Cigarroa and LMC. Understandably, the Supreme Court rejects that as a way of defining exclusionary conduct; it held that "alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim" under Section 2. *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko LLC*, 540 U.S. 398, 408 (2003). The Court holds that even a true monopolist can decline to help a potential competitor, in part because

64

courts' "[e]nforced sharing" of personnel and resources among market competitors discourages investment, undermines the purpose of antitrust law, and casts courts in "a role for which they are ill-suited." *Id.* The district court correctly understood that requiring Cigarroa to work at DHL on pain of antitrust liability would make the court a central planner, assessing how much support each hospital or facility needed and allocating doctors' time among them (ROA.6837). That is not the purpose of antitrust law.

3. *An alleged "threat" against a single doctor—a threat with no impact on competition—does not demonstrate a "dangerous probability" of market power.*

The second conduct DHL challenges as exclusionary was the supposed threat to Feldman. Based on *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), DHL argues that when a monopolist threatens a third party who could aid a competitor, that is exclusionary. Appellants' Brief 28-31.

There was no such threat in this case, as described above, and as a matter of law, one could not be inferred. But even assuming that a *Microsoft-*style threat had been made, it would make no difference.

First, DHL ignores that even though the *Microsoft* court found threats could be exclusionary, the threats nevertheless did not constitute attempted monopolization. While the court found that Microsoft's threats blocked Intel from aiding Microsoft's competitor, the threats did not create a "dangerous

probability" of monopoly power over the web browser market at issue. *See id.* at 80-84. The appellate court observed that any entry barriers resulting from the threats were only a "possible" consequence of Microsoft's threats, and the evidence did not prove the barriers "would be 'significant' enough to confer monopoly power." *Id.* at 83. Similarly, there was no evidence that the purported threat at issue in the present case would confer monopoly power, as confirmed by DHL's ongoing competition. A lone doctor in Laredo, Texas, is no Microsoft, and DHL—part of a multi-billion-dollar international chain of hospitals—is no shrinking violet.

Second, under *Taylor* conduct is exclusionary only if it would injure competition in the market (not just injure a competitor) if it were to succeed. 216 F.3d at 482-83. Here, DHL claims that defendants conspired to threaten Feldman, but there was no indication that Feldman's arrival in Laredo would have resulted in lower market prices or higher market output, rather than simply shuffling procedures around (ROA.6833-42). A supposed threat against one doctor that does not affect the market falls short of exclusionary conduct for Section 2 purposes.

### 4. A "holistic" review of the facts changes nothing.

DHL does not explain any error in the district court's reasoning based on whether conduct was viewed separately or together. This Court showed in

*Taylor* that even if different actions are evaluated together based upon the circumstances, pro-competitive conduct does not become actionable simply because it is connected to exclusionary conduct. 216 F.3d at 484. Moreover, when combined exclusionary and non-exclusionary conduct is challenged, only the damages resulting from the exclusionary conduct support a cause of action. *Id.* at 484-85. The district court correctly concluded that the conduct here was not anticompetitive "[w]hether considered separately or together" (ROA.6845).

## V.   DHL HAS NO ANTITRUST INJURY AND RAISED NO FACT ISSUE ON AN ANTITRUST CLAIM.

The district court held there was no antitrust injury, but it chose to decide DHL's antitrust claims on other grounds   (ROA.6811-13). DHL nevertheless argues that it suffered "classical" antitrust injury. Appellants' Brief 59-61. DHL did not suffer such injury.

Antitrust standing has "three elements: '1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit.'" *Pulse Network LLC v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022). The antitrust injury element requires "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," and which reflects "the anticompetitive

effect" of the violation. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Courts have not been consistent in using these terms. In some cases, this Court has used the term "antitrust injury" to include injury-in-fact and injury to competition, *see, e.g.*, *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 580 (5th Cir. 1982), while in other cases this Court has treated injury to competition as a substantive element of the Sherman Act cause of action rather than an element of the antitrust standing doctrine, *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997). But however these concepts are framed, DHL's claims fail.

## A.   DHL is not an excluded competitor.

DHL argues that its case is a "classical" "excluded competitor" case of the kind described in *Jefferson*, and therefore presents antitrust injury. For obvious reasons, DHL's case is not like *Jefferson*. There, the plaintiff was a hospital excluded from a PPO network by competing hospitals, allegedly rendered unable to serve that PPO's patients. *Id.* at 303-04. The court found this "excluded competitor" claim based on a "direct" injury to represent a "classical" antitrust claim. *Id.* at 305-06.

DHL does not claim it is an "excluded competitor" in the *Jefferson* sense. Instead, DHL says that its antitrust injury *as a hospital* is "[b]ecause

of Dr. Feldman's exclusion" *as a physician*. Appellants' Brief 61. Because DHL's alleged injury is an indirect result of *someone else's* exclusion rather than its own, DHL's claim does not fit the "classical" label used in *Jefferson*. *Direct* injury was critical in *Jefferson*, which explained that if a plaintiff is an indirect victim, it may not be the "proper plaintiff" to complain of the antitrust violation at issue. *Id.* at 306. In such cases, the court must weigh antitrust standing and injury, which may be lacking. *See id.*; *see also Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 320-22 (5th Cir. 2009) (no antitrust injury when plaintiff's loss sprang from an inability to do business with the direct victim of monopolizing conduct).

Moreover, this Court affirmed summary judgment against the plaintiff hospital in *Jefferson* because it had not shown injury to competition. 123 F.3d at 311-12. The hospital alleged it lost revenues from being excluded from the PPO network, but there was no proof the exclusion "substantially affected its long-term viability as a competitor" or that the specific PPO from which it was excluded was "critical to its ability to compete." *Id.*

The same outcome would apply here. DHL argues that Dr. Feldman was excluded from the physician services market, but even if that were the case, it would not mean DHL was excluded from the facility services market. DHL would only be excluded if losing Feldman meant it was unable to work

69

with other physicians. *See Eisiai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3rd Cir. 2016) ("For example, if customers are free to switch to a different product in the marketplace but choose not to do so, competition has not been thwarted—even if a competitor remains unable to increase its market share."). But DHL has never been unable to find the physicians it needs to participate in the facility services market. To the contrary, DHL hired Cilingiroglu, Moosa, and others, as well as a functionally limitless supply of locum tenens doctors (ROA.2700-01, 3338-45, 7581 [¶ 120]).

Whether the issue is labeled antitrust injury under *Jebaco* or injury to competition under *Jefferson*, DHL's claim fails for want of evidence that Feldman was critical to DHL's ability to compete.

## B.    Courts reject the notion that a single physician's exclusion demonstrates a harm to competition.

DHL suggests that as long as it can demonstrate a "single loss to itself" resulting from a competitor's conduct that interferes with choices in the market, DHL suffered antitrust injury. Appellants' Brief 61. In two respects, DHL misapplies the concept of antitrust injury.

First, if the market is unaffected, antitrust law is not implicated—even if a plaintiff asserts it was injured in some respect by a competitor's tort or other conduct. "Antitrust injury fleshes out the basic idea that the antitrust laws were enacted for the protection of *competition*, not *competitors*." *Pulse*,

30 F.4th at 488 (quotation marks omitted). A plaintiff who alleges injury to itself without showing injury to competition in the relevant market does not state an antitrust claim. *Marucci Sports v. NCAA*, 751 F.3d 368, 376 (5th Cir. 2014). "A restraint should not be deemed unlawful, even if it eliminates a competitor from the market, so long as sufficient competitors remain to ensure that competitive prices, quality, and service persist." *Id.* at 377.

That focus on competition, not competitors, is why this Court has never accepted the contention that losing a single physician from the marketplace or from a specific hospital's staff demonstrates an impact on competition in general, absent market-wide impact on prices. *See Taylor v. Christus St. Joseph Health Sys.*, 216 F. App'x 410, 411-12 (5th Cir. 2007) (affirming dismissal of excluded physician's claim because he had not "alleged that there was a rise in the price of gastroenterology services above a competitive level, a decrease in the supply of gastroenterologists in the relevant market, or a decrease in the quality of gastroenterology service provided"); *Benson v. St. Joseph Regional Health Ctr.*, 575 F.3d 542, 549 (5th Cir. 2009) (hospital's denial of physician's privileges and his resulting inability to serve patients at a hospital of his choice did not demonstrate adverse impact on competition); *Pisharodi v. Columbia Valley Healthcare Sys. LP*, No. 1:14-CV-0004, 2015 WL 11123315, at *2 (S.D. Tex. Jan. 29, 2015) (concluding "there must be an

actual or threatened injury to the market as a whole, not just to a particular plaintiff," and dismissing claim when physician's exclusion from a facility had "not had an adverse impact on neurological services for the market as a whole"), *aff'd*, 615 F. App'x 225 (5th Cir. 2015).

Second, mere injury-in-fact does not constitute antitrust injury under *Brunswick* unless the injury flows from the alleged harm to competition in the relevant market. 429 U.S. at 489. For DHL to claim antitrust injury based on Feldman's exclusion from the interventional cardiology service market, DHL would need to allege an injury that flowed from the loss of competition Feldman could have provided in the market—i.e., an injury from the lost procedures he would have performed in the market. But DHL's economist concluded that DHL lost no procedures due to Dr. Feldman's exclusion—all the work he would have done was handled by others at DHL (ROA.8645). Even if Feldman had been blocked, any injury that would have caused DHL was not an injury that flowed from reduced competition in the interventional cardiology services market, because competition was not reduced.

Because Feldman's purported exclusion had no impact on the market for interventional cardiology services, there was no injury to competition. Without summary judgment evidence of an injury to competition, DHL did not raise a fact issue on its antitrust claims.

## Argument – Cigarroa Defendants' Cross-Appeal

As argued above, the district court properly dismissed DHL's antitrust claims because, among other things, the record showed that DHL could not prove "competitive harm." On this appeal, DHL seeks to lower the bar for showing competitive harm: DHL seeks a presumption of market power based on the defendants' market share, even without evidence of defendants' ability to control market output or price.

If this Court were to accept DHL's watered-down competitive-harm argument, however, that would require revisiting another ruling based upon that same rationale: the dismissal of the Cigarroa defendants' counterclaim against DHL (ROA.3291-3307).

In that counterclaim, the Cigarroa defendants sued DHL and Laredo Physicians Group for attempted monopolization in violation of Sherman Act § 2 (ROA.1979-99). The district court dismissed the counterclaim based on the plaintiffs' Rule 12(b)(6) motion (ROA.3291-3307).

## I.    A RULING ON A RULE 12(B)(6) MOTION IS REVIEWED DE NOVO.

This Court reviews de novo a ruling on a Rule 12(b) motion to dismiss. *Marucci Sports*, 751 F.3d at 373. To survive a motion to dismiss, the pleader "need only plead 'enough facts to state a claim to relief that is plausible on its face.'" *See Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010).  If

the bar for proving "competitive harm" were as low as DHL says it is, the Cigarroa defendants' counterclaim would state a plausible claim.

## II. IF THIS COURT REVERSES THE RULING ON DHL'S CLAIMS IT MUST REVERSE THE RULING ON THE CIGARROA DEFENDANTS' CLAIM.

DHL was the only party in this lawsuit that successfully prevented competition in a relevant market. DHL filed this lawsuit against LMC and Cigarroa along with a companion arbitration demand against Laredo's only cardiovascular surgeon, Santos, who intended to build out LMC's cardiology offering by moving his practice to LMC. When DHL initiated litigation, Santos's cardiovascular surgery practice was shut down for a year (ROA.1933-34), giving DHL's new surgeons a crucial head start, and temporarily blocking Cigarroa Institute cardiologists from performing high-risk interventional procedures requiring surgical backup.

Discovery revealed how DHL abused the litigation process to accomplish this goal. DHL said when it filed this lawsuit Santos was a critical piece of its cardiology offering, without which it was likely to close its doors, but those assertions were false when made. Internal DHL communications revealed that long before Santos left, DHL had decided to dismiss him in favor of the Morales Group. R.E. Tab 6. Even though DHL had no plans to keep using Santos, DHL executives discussed that it would be "beneficial strategically to not allow him to just go over to LMC" because "it shouldn't

74

be easy" for him to compete with DHL. R.E. Tab 5. So DHL represented to the district court that Santos was the linchpin of their practice (ROA.238-41, 4208-09, 4224, 4233-34, 4251-52). And the plan worked. DHL extended for more than a year its 100% market share in cardiovascular surgery and high-risk interventions (ROA.2870-71, 2846, 6097, 9863).

After this scheme was revealed in discovery, the Cigarroa defendants filed this counterclaim for the harm they suffered from it, but the district court dismissed it, correctly ruling that DHL's high market share and the alleged blocking of a single surgeon from working with the Cigarroa Institute did not demonstrate a power to exclude surgeons from the market in general (ROA. 1979-99, 3291-3307). In much the same way, the court would later rule that the alleged exclusion of Dr. Feldman did not demonstrate a harm to competition when there were other cardiologists who continued practicing at DHL (ROA.6840-41).

The district court applied competitive-harm principles even-handedly; if DHL seeks to lower the bar, it cannot lower the bar only for itself. If—and only if—this Court were to vacate or reverse the judgment on DHL's claims, this Court would also need to vacate or reverse the dismissal of the Cigarroa defendants' counterclaim.

**A.    The counterclaim plausibly alleged that DHL filed suit to maintain a monopoly and therefore harmed the Cigarroa defendants.**

In a Section 2 attempted monopolization case, the plaintiff must allege anticompetitive conduct by the defendant with specific intent to monopolize, and a dangerous probability of achieving monopoly power in the relevant market. *Spectrum Sports*, 506 U.S. at 456. The counterclaim alleges that.

First, the counterclaim alleges DHL schemed to sideline independent cardiologists and block them from creating effective competition at LMC: in retaliation for Dr. Cigarroa's opening a clinic that competed with DHL on outpatient procedures, DHL threatened to squeeze Cigarroa and his son out of DHL and replace them with DHL-controlled cardiologists (ROA.1987-89 [¶¶ 26-30]). When Cigarroa moved his practice to LMC, DHL initiated this litigation and an arbitration against Santos to deter the competitive threat to DHL's new team (ROA.1991-92 [¶¶ 36–38]). For a year, Cigarroa and LMC could not treat high-risk interventional cardiology patients; LMC was unable to perform open heart surgeries; and the defendants incurred attorneys' fees defending DHL's sham lawsuit (ROA.1992-93, 1995-96 [¶¶ 40, 48-50]). Dr. Cigarroa pleaded to recover the litigation costs resulting from this scheme (ROA.1997).

Second, the counterclaim alleged that DHL's tactics preserved its 100% market share in cardiovascular surgery and thus posed a mirror-image risk of monopoly power in interventional cardiology—just as DHL had alleged in its own complaint (ROA.1996-97). As DHL admitted in its complaint, at the time suit was filed, it employed Dr. Santos, the only cardiovascular surgeon in Laredo, and as a result, every Laredo patient who needed cardiovascular surgery services had to be treated at DHL—even requiring LMC patients to transfer to DHL for surgery (ROA.231, 238-39). DHL further alleged that having exclusive control over a local cardiovascular surgeon was critical to effectively competing in interventional cardiology; that without a cardiovascular surgeon, a hospital could well be forced "to shut down their cardiology program"; and that a hospital employing the only surgeon would necessarily be "the only hospital provider of acute cardiological services in Laredo" (ROA.216, 237, 240, 255). The complaint alleged that any hospital with more than 70% market share in any service would have market power and the ability to increase price (ROA.235, 243, 246-47). The counterclaim incorporated and relied upon these allegations from DHL's complaint to establish that DHL's tactics were intended to produce the same market conditions that DHL accused the defendants of trying to create (ROA.1996), market allegations the district court found sufficient to survive a motion to

dismiss (ROA.930), and which DHL was estopped to deny in any event. *See Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 553 (5th Cir. 2014) (standard for judicial estoppel).

## B.    The counterclaim had plausible allegations that DHL's lawsuit was a sham based on misrepresentations.

The counterclaim further alleged that DHL engaged in anticompetitive conduct—specifically, sham litigation. The district court ruled "the Cigarroa Defendants plausibly allege that Plaintiffs made intentional, false allegations cutting at the core of Plaintiffs' case . . . with the subjective intent of using this litigation to interfere with competition" (ROA.3300-02). In that regard, the counterclaim alleged that DHL "did not believe" its "core allegations of antitrust injury" (ROA.3301-02). These were "sufficient facts to overcome—at the motion to dismiss stage—the plaintiffs' claim of *Noerr-Pennington* immunity" (ROA.3300).

A party cannot claim *Noerr-Pennington* immunity when its antitrust claim is a sham, meaning (1) the suit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) the suit must "conceal[] 'an attempt to interfere *directly* with the business relationships of a competitor,' through the 'use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive

78

weapon[.]'" *Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993) (citations omitted) ["*PREI*"].

The counterclaim satisfied the above test. The evidence showed DHL made objectively baseless (indeed, knowingly false) allegations central to its claims with the documented intent of making sure it would not be "easy" for Santos to compete—a plain and simple desire to use the litigation process to interfere with competition. Discovery revealed that by August 2021, DHL had already retained new surgeons and planned to replace Santos with them during October and November 2021 (ROA.1990-91 [¶ 34]). Nevertheless, DHL falsely alleged that when Dr. Santos gave notice in September 2021 that he would resign effective December 2021, his departure affected their ability to compete, caused them to retain a temporary cardiovascular surgery team (that they had already retained), and was likely to shut down the practice of cardiology at DHL (ROA.1992-96 [¶¶ 38–50]). It further alleged that the Cigarroas' departure from DHL put the viability of DHL's acute cardiology program in jeopardy, despite internal documents showing DHL regarded the Cigarroas' service as unnecessary (ROA.1991 [¶ 36]). The evidence also showed DHL sued shortly after internal discussions over fears Cigarroa would publicize a death caused by DHL's itinerant surgery team (ROA.1995 [¶¶ 48-50]).

These false allegations established an additional exception to *Noerr*: if a party makes intentional misrepresentations to the court that "deprive[s] the litigation of its legitimacy," the party cannot claim the protection of *Noerr*. In *Liberty Lake Investments, Inc. v. Magnuson*, 12 F.3d 155 (9th Cir. 1993), the Ninth Circuit concluded that the *PREI* two-part sham test applies "in the absence of proof that a party's knowing fraud upon, or its intentional misrepresentation to, the court deprive the litigation of its legitimacy." *Id.* at 159. Other courts agree there is "no reason to believe that the right to petition [protected by *Noerr*] includes a right to file deliberately false complaints." *Whelan v. Abell*, 48 F.3d 1247, 1253–54 (D.C. Cir. 1995); *see also Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287, 295–96 (5th Cir. 2000) (noting that "falsehoods" lack First Amendment immunity); *Woods Expl. & Prod. Co. v. Aluminum Co. of Am.*, 438 F.2d 1286, 1297–98 (5th Cir. 1971) (false filings abused administrative process and therefore lacked *Noerr* immunity); *Mercatus Grp. LLC v. Lake Forest Hosp.*, 641 F.3d 834, 842 (7th Cir. 2011) ("fraudulent misrepresentations may render purported petitioning activity a sham not protected from antitrust liability").

**C.    If DHL may pursue an antitrust claim regarding the alleged exclusion of Feldman, the Cigarroa defendants may pursue their claim regarding exclusion of Santos.**

Although the district court determined that the Cigarroa defendants had plausibly alleged DHL's sham-litigation strategy, the court nevertheless dismissed the counterclaim—correctly—because the exclusion of a doctor (by sham litigation or otherwise) does not demonstrate harm to competition or antitrust injury (ROA.3305-07). This was so even though Cigarroa Institute cardiologists had to actually turn away patients for want of surgical backup (ROA.6097, 7741 [¶ 25 and note 2]).[7]

The district court held that these forgone procedures did not show that DHL had blocked competition because one needed to prove that DHL had also "prevented LMC from retaining a different surgeon during this time to serve as a backup" (ROA.3307). This, of course, was the correct conclusion. As long as it was possible for LMC to engage cardiovascular surgeons, then it remained possible for LMC and the Cigarroa defendants to perform high-risk interventions, and their injury was not the result of blocked competition.

---

[7] The district court incorrectly ruled that this theory of harm causation had been argued but not pleaded (ROA.3306-07). The counterclaim alleged that Cigarroa's practice was aided by Santos's surgical practice (ROA.1985-86, 1989) and the scheme to displace Santos aimed to monopolize cardiovascular surgery and interventional cardiology (ROA.1996 [¶¶ 53-54]). The counterclaim further adopted DHL's relevant market analysis (ROA.1992, 1996), including the allegation that cardiovascular surgery capacity is critical to offering interventional services (ROA.216, 237, 240, 255).

Similarly, as described above, any injury DHL claims because of Dr. Feldman's absence did not result from any inability to compete for interventions. In fact, DHL was able to retain interventional cardiologists on both a permanent and locum tenens basis; DHL continued competing for and performing interventional procedures; and DHL did not prove any loss of procedure volume resulting from Feldman's absence. Feldman may have been a resource DHL could have used to compete in the relevant market, but substitute resources were available and were actually used. Competition in the relevant market—interventional cardiology procedures—did not change.

DHL asks this Court to conclude that if DHL lost a resource that could be used in competition, DHL's injury should be deemed harm to competition —even if competition did not in fact suffer. Appellant's Brief 61. If this Court were to accept that invitation and broaden the scope of what constitutes an antitrust injury, the injury the Cigarroa defendants suffered would qualify as well. DHL had alternatives to Feldman; it used them to continue competing. But DHL *actually* blocked LMC and the Cigarroas from competing when it blocked them from working with Dr. Santos.

The correct result is to affirm the district court's decision in full, but if this Court were to reverse summary judgment on DHL's claim, it should also reverse dismissal of the Cigarroa defendants' counterclaim.

82

# Conclusion

This Court should affirm the judgment—or, alternatively, reverse the judgment insofar as it dismisses the Cigarroa defendants' counterclaim and remand it for further proceedings—and award costs.

Respectfully submitted,

*/s/ James G. Munisteri*
James G. Munisteri
jmunisteri@foley.com
Stacy R. Obenhaus
sobenhaus@foley.com
Thomas Leonard
tleonard@foley.com
Foley & Lardner LLP
Wells Fargo Plaza
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel:   713.276.5500

Counsel for
Laredo Texas Hospital Company LP

*/s/ Jason M. Powers*
Jason M. Powers
Texas Bar No. 24007867
Federal Bar No. 23567
jpowers@velaw.com
James L. Leader, Jr.
Texas Bar No. 24083371
jleader@velaw.com
Vinson & Elkins LLP
1001 Fannin Street, Suite 2500
Houston, Texas 77002-6760
Tel: 713.758.2522

Counsel for Dr. Ricardo Cigarroa
and Laredo Cardiovascular
Consultants P.A. d/b/a Cigarroa
Heart and Vascular Institute

# Certificate of Compliance

This document complies with word limits of Federal Rule of Appellate Procedure 32 because, excluding parts of the document Rule 27(a)(2)(B) and Rule 32(f) exempt, this document contains **15,281** words in accordance with Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i).

This document complies with typeface requirements of Rule 32(a)(5), and the type-style requirements of Rule 32(a)(6), because this document was prepared in proportionally spaced typeface using Microsoft® 365 software in Georgia 14-point font.


*/s/ Stacy R. Obenhaus*
Stacy R. Obenhaus